**UNITED STATES of America**

v.

**Steven L. BIELAK.**

**Crim. No. HCR 85–23–01.**

United States District Court,
N.D. Indiana,
Hammond Division.

May 18, 1987.

Gregory Vega, John Hoehner, Patrick Hansen, Asst. U.S. Attys., N.D. Ind., Hammond, for plaintiff.

Michael B. Nash, Chicago, Ill., for defendant.

## ORDER

MOODY, District Judge.

This matter comes before the court following a hearing on the United States' ("Government") Petition to Vacate Plea Agreement and Reinstate Indictment held April 30 and May 1, 1987. At the hearing,

the Government asserted that defendant Steven L. Bielak violated the terms of his plea agreement by failing to cooperate truthfully and candidly with investigators and/or failing to testify truthfully and candidly before a federal grand jury. After considering all the evidence and arguments offered at the hearing, the court finds that the Government's petition should be DE-NIED.

## I.

### BACKGROUND

Steven L. Bielak, a former state-court judge of the Lake County Court, Lake County, Indiana, was originally indicted, along with a codefendant, on June 29, 1985 as a result of his involvement and participation in a scheme to "fix" traffic tickets with the Lake County Court System. The ticket fixing involved a willful failure on the part of Bielak and his court personnel to notify the Indiana Bureau of Motor Vehicles ("BMV") of particular traffic offenses, usually drinking while under the influence of alcohol ("DUI"). Bielak would find a traffic offender guilty and would impose a fine and/or probation, however, he purposely would not notify the BMV of the conviction so there would be no mention of the offense on the offender's driving record. The offender would benefit in that if he or she were stopped again by a police officer, on any other traffic violation, there would be no indication of the prior offense and, in addition, the offender's auto-insurance rates would not reflect the violation.

Bielak entered into a plea agreement with the Government on January 26, 1986, and this court accepted that agreement and sentenced Bielak accordingly on March 28, 1986. By the terms of the agreement, Bielak pleaded guilty to two counts of mail fraud, 18 U.S.C. § 1341, in exchange for which the Government agreed to dismiss the remaining 26 counts in the original indictment. In addition, Bielak agreed to cooperate with federal authorities in their continuing investigation of the ticket-fixing scheme in the Lake County Court System. The five-page plea agreement, filed Janu-

ary 6, 1986, and signed by defendant Bielak, his counsel Michael B. Nash and then Assistant United States Attorney ("AUSA") James B. Meyer, contains the following subparagraph (e) of paragraph nine on pages three and four:

(e) Subject to the provisions of Rule 11 of the Federal Rules of Criminal Procedure, I will discuss fully, truthfully, and candidly my knowledge of the events and persons involved in the charges in this case and my knowledge of activities within the Lake County County Court system which corruptly affect the operation of that court system, with agents of the Federal Bureau of Investigation, officers of the Indiana State Police, U.S. Probation officers, and, such other federal and state investigative agencies as may become involved in these matters, and representatives of the United States Attorney's Office. If requested by the Government to do so, I agree to testify truthfully, candidly, completely in Grand Jury proceedings, and any U.S. District Court proceedings. In regard to my testimony either before a Grand Jury or in any other judicial proceeding, including trial, I understand that should I not testify truthfully, that I may be prosecuted for the crime of perjury and this plea agreement would be void. Other than a prosecution for perjury the information I provide the Government will not be the basis of any further proceedings;

The Government's argument at the hearing was that Bielak violated the terms of subparagraph (e). Briefly stated, the Government alleged that during three separate interviews with investigators Bielak informed the Government that a Peter Russell was involved in fixing a DUI ticket for a Dennis Waycaster. Bielak, according to the Government, told the investigators that Russell came to him personally and asked for the favor. Bielak also testified before a federal grand jury on September 17, 1986, and repeated his story that he had met personally with Russell about fixing

Waycaster's DUI ticket. Based on this information, the Government brought an indictment against Peter Russell for the crimes of making false statements before a grand jury and obstructing the administration of justice in violation of 18 U.S.C. §§ 1623 and 1503, respectively.[1] According to the Government, however, Bielak changed his story on the eve of Russell's trial, wherein Bielak was to be called as a principal Government witness, and denied that Russell ever met personally with him before fixing the Waycaster ticket. Because of this discrepancy between Bielak's testimony before the grand jury and his statements to investigators immediately prior to Russell's trial, the Government filed a petition to have Bielak's plea agreement voided and to reindict him on the remaining 26 counts.

At the hearing, Bielak argued that his version of what happened with Peter Russell was consistent throughout all his interviews, including his grand jury testimony. Bielak maintained that he was involved in fixing over one hundred tickets between 1981 and 1985 and that generally individuals seeking a favor on a ticket would approach either Robert Balitewicz, Bielak's bailiff, or Ed Lukawski, the Clerk of the Court. Then, either Balitewicz or Lukawski would go to Bielak with the name and file, and the ticket would be fixed without Bielak ever speaking or meeting with, or even seeing the individual receiving the favor. Thus, according to Bielak, when he stated to investigators and to the grand jury that someone was "brought in" or that they "approached" him about fixing a ticket, he meant that that someone went through either Balitewicz or Lukawski.

Bielak argued that this operational scenario (i.e., someone—Balitewicz or Lukawski—Bielak) and the meaning of expressions like "brought in" and "approached"

were commonly understood to be synonymous by himself, the various investigators and the grand jury. Therefore, following Bielak's argument, he was truthful to both investigators and the grand jury.

## II.

## DISCUSSION

### A. Arguments at the Hearing

The proper procedure and applicable burdens of proof for a hearing on whether a defendant breached his plea agreement were recently set out by the Seventh Circuit in *United States v. Verrusio*, 803 F.2d 885 (7th Cir.1986). Defendant Verrusio, like Bielak, had agreed to cooperate with investigators and to testify at trial. *Id.* at 887. When the Government suspected that Verrusio had lied it sought to have his plea agreement voided and the district court agreed. *Id.* On appeal, the Seventh Circuit held that due process required a judicial determination that the defendant breached the plea agreement, *id.* at 888, and that preferably the Government should move to have the agreement set aside before reindicting the defendant, although it was not constitutionally required, *id.* at 889. Finally, the court found that at such a hearing the burden was on the Government to show by a preponderance of the evidence that the defendant breached his agreement. *Id.* at 894–95.

After considering all the evidence and testimony offered at the hearing, the court finds that the Government was successful in demonstrating, by a preponderance of the evidence, that defendant Bielak was untruthful either before the grand jury on September 17, 1986 or to investigators on April 8, 1987.

First, the court looks to the portion[2] of Bielak's grand jury testimony which was

---

1. According to the Russell indictment, which was admitted into evidence at the hearing as Government's Exhibit #3, Russell testified before a federal grand jury in August of 1985 that he was not involved in the ticket-fixing scheme at the Lake County Court.

2. The complete text of Bielak's grand jury testimony was not made available to Bielak for

purposes of this hearing because: (1) Bielak informed the court that he already had copies of pages 1–62; (2) the Government argued that there was an ongoing investigation which would be damaged by such disclosure; and (3) the court found that the subject matter of most of his testimony was irrelevant to the issue of this hearing.

introduced into evidence as Government's Exhibit # 2. The six pages of his testimony in Exhibit # 2 (pp. 113–118) relate to Peter Russell's efforts to fix the DUI ticket for Dennis Waycaster. Relevant segments of those pages read as follows:

### Page 113

Q. I want to ask you about one more item, which is currently marked, and I suppose will always be marked, as Grand Jury Exhibit Bielak 15 for identification and then we can break for lunch, if that's all right with you.

I want to hand you what I have just mentioned. That is Grand Jury Bielak 15. That is, again, a photocopy of a jacket involving the drunk driving situation of one—

A. Dennis Waycaster.

Q. W-a-y-c-a-s-t-e-r, is that correct?

A. Correct.

Q. Is that another matter that you were involved in as far as a fix is concerned—

A. Yes.

Q. —as far as a favor is concerned?

A. Sure was.

Q. If you could take a look at the jacket, there is an indication that the matter was disposed of on January 20th, 1982. Is that entry in your handwriting, sir?

A. Yes, I'm sure it is. Yes.

Q. Who approached you requesting assistance on this

### Page 114

drunk driving matter?

A. Okay. On this one—I was trying to find it in my notes—I was approached by an individual by the name of Pete Russell, who was formerly the Court Administrator for East Chicago City Court.

Q. Why don't you look at page 7 of that Exhibit 3, line number 5.

A. Right. In February of '82 I was approached by Dennis Waycaster. Sometimes we back dated these things a little bit.

Q. Back dated the jackets?

A. The entry, yes.

Q. All right.

A. *I was approached by Mr. Russell. He asked me if I could do a favor for him for a Dennis Waycaster.*

Q. Let me stop you for a moment, Mr. Bielak.

A. Uh-huh.

Q. Who was Pete Russell?

A. I'm sorry. He was the Court Administrator for Judge Callahan in the East Chicago City Court and for the last three or four years has been an investigator in the Lake County Prosecutor's Office.

### Page 115

Q. To your knowledge, is he still there?

A. Yes, to my knowledge.

Q. He approached you about the way—he approached you about doing a favor. Would you pick it up from there, please?

A. *Just asked me can you help Waycaster, and I think we had helped Pete on a couple speeding tickets or something before. And, yeah, I told him no problem.*

Now, I had disposed of the case and after I had disposed of the case, an attorney by the name of Horka came out and got the bond, picked the bond up. I didn't know that Mr. Horka was involved.

Q. Richard Horka?

A. Yes.

Q. H-o-r-k-a?

A. I think we call him Dick Horka. Came in and he thanked me for helping—told me, you know, Waycaster wasn't a bad kid and thanked me, and picked up the bond.

Q. What was your impression of that meeting? I mean, were you surprised, were you expecting it, did you have any idea that Mr. Horka was involved?

### Page 116

A. I had no idea that Mr. Horka was involved, but I knew that Mr. Horka and Judge Callahan were very—or were fairly close. I had met Mr. Horka through Judge Callahan, I will put it that way. I don't know how close they were.

Q. *Now, when Mr. Russell came to you court requesting a favor, did he talk to you in person?*

A. *Yes.*

Q. Do you know if he also talked to your administrator, Mr. Balitewicz?

A. Probably. See, Pete was involved in our traffic school. It was probably on a night that he was out there on traffic school that he mentioned this.

Q. To your knowledge, did Mr. Waycaster appear in court on this case?

A. No, I don't think he did. I don't remember him appearing.

Q. And—

A. I would have entered Mr. Horka's appearance on the jacket if I had known he was going to be an attorney. It was already disposed of by the time Horka came out.

Q. On Grand Jury Exhibit 15 is Mr. Horka's

*Page 117*

appearance entered?

A. No.

Q. After disposing of the case, did you talk to Mr. Russell in any way about Waycaster's bond?

A. No, because it wasn't too long after we disposed of it, like, maybe a week, ten days, at the most Mr. Horka came out and picket up the bond.

I assumed that Pete was going to tell Waycaster it was disposed of and Waycaster would come out and pick his bond up.

Q. Besides the Waycaster matter, did Mr. Russell have occasion to come to your court on any other occasion requesting favors or assistance?

A. Just a couple that I rememeber. Mostly speeding tickets. Waycaster would be the only DUI ticket.

Q. Would that be reflected on Exhibit—

A. 3.

Q. —3, page 7?

A. Yes. Three speeding tickets and a plate charge.

Q. That would be Kokot, K-o-k-o-t, for speeding?

A. Right.

Q. Hutching, H-u-t-c-h-i-n-g, for expired plates?

*Page 118*

A. Houratides—

Q. Houratides, H-o-u-r-a-t-i-e-s, for speeding?

A. Right.

Q. Ackerman for speeding and Waycaster?

A. Right. Some of those he might have talked to Bob Balitewicz. And it would be Bob telling me that Pete was the one who had contacted him.

Government's Exhibit # 2 (emphasis added).

As the emphasized sections of this testimony indicate, Bielak stated that he met with Peter Russell *personally* before actually fixing Waycaster's ticket. Most damaging to Bielak is the question put to him and his answer found on page 116:

Q. Now, when Mr. Russell came to your court requesting a favor, did he talk to you in person?

A. Yes.

In contrast to the face-to-face meeting with Russell on the Waycaster ticket, Bielak recalled other tickets involving Russell where he did not meet with him personally. At page 117 Bielak was asked:

Q. Besides the Waycaster matter, did Mr. Russell have occasion to come to your court on any other occasion requesting favors or assistnce?

Bielak responded affirmatively and identified the additional individuals and stated that on those other occasions Russell probably met with Balitewicz. Bielak's response at p. 118 reads:

A. Right. Some of those he might have talked to Bob Balitewicz. And it would be Bob telling me that Pete was the one who had contacted him.

Bielak distinguished between the way the Waycaster ticket was handled with the other tickets without any prompting by the questioner.

The Government then offered the testimony of Indiana State Trooper Gregory D. Scott who, along with AUSA Patrick Hansen, interviewed Bielak on April 8, 1987 in preparation for the Russell trial which was scheduled to begin on April 13, 1987. According to Scott, Bielak met with him and Hansen in the United States Attorney's

office in Hammond, Indiana. Bielak was given a copy of his September 17, 1986 grand jury testimony and his notes and allowed to review them for about ten or fifteen minutes. Shortly thereafter, when the conversation focused on the upcoming Russell trial, Bielak indicated that he had "problems" with some of his grand jury testimony. Specifically, Bielak informed Scott and Hansen that, despite his statements to the grand jury, he had not met personally with Russell until after the ticket had been fixed. Bielak stated that he could not testify at trial that Russell came to him personally to ask for a "favor" on the Waycaster ticket.

In response, Bielak argued at the hearing that his grand jury testimony represented in Government's Exhibit # 2 had to be considered in a broader context. Bielak maintained, and the Government stipulated, that he had cooperated with the Government in its investigation by discussing the details of well over 20 different ticket-fixing episodes and that in the majority of those situations he never met personally with the individual asking for the favor. Instead, the individual desiring the ticket fixed would go through Balitewicz or Lukawski. Based on the frequency of the Balitewicz scenario, Bielak argued that it was clear to both him and the investigators that when he said Russell "approached" him he actually meant that Russell went through Balitewicz.

The court agrees that Bielak's grand jury testimony should be considered in a broader context. To do this, the court looks to the redacted version of Bielak's complete grand jury testimony made available and admitted into evidence at the hearing as Government's Exhibit # 9. This more detailed copy of his grand jury testimony confirms that Bielak did in fact discuss numerous ticket-fixing episodes. And, as the defendant asserted, in the majority of those situations Bielak testified that the individual seeking the favor went through Balitewicz. However, in contrast to most cases, there are several incidents when Bielak testified in precise language that he remembered meeting personally with particular individuals. For example,

occasions when Bielak was clear and unequivocal about meeting with people other than Balitewicz or Lukawski on fixing tickets are demonstrated at pages 83, 98 and 120 of Government's Exhibit # 9.

At page 83, Bielak testified to the grand jury:

A. [Name deleted] and [name deleted] came in to my chambers to see me, told me that [name deleted] was a friend of theirs. Basically, [name deleted] did the majority of the talking.

At page 98, Bielak further testified in regards to another ticket:

A. I showed Jim Frank coming in on 3—that he talked to me.

Finally, at page 120 in regard to yet another ticket, Bielak testified:

A. Yes. She brought an individual in by the name of—[name deleted]. I think it was [deleted]. And she came out to my office, and she knew him. He had—his son had a DUI. And she introduced me to [name deleted] and his son, but that was her only involvement in the DUI.

\* \* \* \* \* \*

A. His son had the ticket. I don't even know if she knew—she knew that the [deleted] wanted to see me. I don't know if she knew what he wanted to see me about. She brought [name deleted] in.

As these excerpts from Bielak's testimony show, not only did Bielak distinguish between individuals who met with him personally and those who went through Balitewicz or Lukawski, but he also was able to recall the extent of an individual's involvement. The testimony at page 120 demonstrates that Bielak understood the significance of someone approaching him personally for help and how it related to that person's degree of culpability. Bielak made clear, at page 120, that he did not know if the woman who approached him knew why the father and son wanted to meet with him.

Moreover, the Government introduced into evidence a redacted copy of a 15–page report of an investigative interview with Bielak which took place on March 21, 1986. A review of that document reveals that Bielak discussed 22 different ticket-fixing cases with investigators that day. Of those 22 cases, 13 went through Balitewicz, 3 went through Lukawski and 4 (apart from the Peter Russell case) went directly to Bielak.[3] Again, this demonstrates that Bielak delineated between direct and indirect contact with those seeking favors.

Bielak understood that the Government was gathering evidence against others and that he was likely to be called as a witness at future trials. He was careful throughout all his grand jury testimony to point out when he did and did not have personal knowledge of someone's involvement in illegal activity. Based on the foregoing review of the evidence, the court finds the Government has shown by a preponderance of the evidence, *Verrusio*, 803 F.2d at 895, that defendant Bielak was untruthful either before the grand jury or with Government investigators.

## B. Breach of the Plea Agreement

■ Having determined that Bielak was in fact untruthful the court next considers whether his untruthfulness constituted a breach of the plea agreement. The correct standard for determining whether a defendant has breached his plea agreement is one of substantial compliance. *United States v. Wood*, 780 F.2d 929, 931–932 (11th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 92, 93 L.Ed.2d 48 (1986); *United States v. Simmons*, 537 F.2d 1260, 1261 (4th Cir.1976) ("to set aside a judicially approved plea bargain ... a judge must find that there has been a substantial breach of the bargain which the court had approved").

■ The facts here show that Bielak was untruthful about meeting with Russell on the Waycaster ticket. Bielak told the grand jury that he met personally with Russell prior to fixing the ticket and that

he did not meet with him later; Bielak then recanted his testimony on April 8, 1987 by informing Trooper Scott and AUSA Hansen that the only time he met personally with Russell was after the ticket was fixed and that Russell went through Balitewicz in seeking the favor. The court finds that these facts constitute a failure on Bielak's part to comply in a substantial manner with the terms of his plea agreement.

First, the plea agreement in subparagraph (e), required Bielak to "discuss fully, truthfully, and candidly [his] knowledge of the events and persons involved in the" ticket-fixing scheme. Bielak was also required to "testify truthfully, candidly, [and] completely in Grand Jury proceedings" about the ticket-fixing scheme. In providing contradictory stories Bielak frustrated one of the Government's purposes for entering into the agreement, that is, to get a true and complete account of the corrupt activities in the Lake County Court System in order to indict and prosecute other individuals involved in the illegal activities. As mentioned earlier, the fact that someone approached Bielak personally, as opposed to going through Balitewicz, had a direct bearing on that individual's degree of culpability. The critical nature of this distinction and its corresponding relationship to the extent of an individual's wrongdoing is obvious; so obvious, in fact, that it would be apparent even to one not schooled in the law. Defendant Bielak, however, was educated in the law (he was a judge); he understood the significance of his statements to the grand jury that he met with Russell in person when Russell first asked about fixing the ticket. Simply put, Bielak was untruthful about an important issue and, as a result, he did not substantially comply with the terms of his plea agreement.

Second, the court finds that Bielak's contradictory statements served to frustrate another of the Government's purposes for entering into the plea agreement. In addition to agreeing to testify truthfully before a grand jury, Bielak also agreed to testify

---

3. In the remaining two cases, Bielak either could not remember or he stated that the request came from both Balitewicz and the individual seeking the favor.

at trial as a Government witness. By giving inconsistent statements to investigators and to a grand jury, Bielak damaged his credibility at trial as a Government witness. These contradictory statements must be disclosed to future defendants as impeachment material under the Jencks Act, 18 U.S.C. § 3500. *United States v. Allen,* 798 F.2d 985 (7th Cir.1986). Thus, if the Government ever calls Bielak as a witness, a defense attorney will be able to direct a jury's attention to his inconsistent statements concerning Russell in order to attack his credibility. Recognizing this possibility, the Government included the provision in the plea agreement requiring Bielak to tell the truth to investigators as well as to the grand jury.

As a result of his recent recantation, Bielak has devalued his worth as a credible Government witness at future trials. In so doing, he has denied the Government of one of its primary benefits from the plea agreement; accordingly, the court finds that Bielak has not substantially complied with the terms of the plea agreement.

### C. Remedy

Finally, having determined that Bielak breached his plea agreement with the Government, the court turns to the issue of the appropriate remedy. By its motion, the Government is seeking a specific remedy—a voiding of the agreement in order to reindict Bielak. Generally, "a defendant's failure to fulfill the terms of the pretrial agreement relieves the government of its reciprocal obligations under the agreement." *Verrusio,* 803 F.2d at 888 (quoting *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.), cert. denied, 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1981)).

However, a plea agreement is a contract, *Verrusio,* 803 F.2d at 887; *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir. 1985); *United States v. Strawser,* 739 F.2d 1226, 1230 (7th Cir.), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Brooks v. United States,* 708 F.2d 1280, 1281 (7th Cir.1983); *United States v. Delegal,* 678 F.2d 47, 50 (7th Cir.1982); "the terms of which necessarily must be inter-

preted in light of the parties' reasonable expectations. The resolution of each case depends upon the essence of the particular agreement and the Government's conduct relating to its obligations in that case." *Fields,* 766 F.2d at 1168 (quoting *United States v. Mooney,* 654 F.2d 482, 486 (7th Cir.1981)).

The operative provision of the plea agreement which the Government relies upon for vacating the contract is subparagraph (e). That provision provides in full:

> Subject to the provisions of Rule 11 of the Federal Rules of Criminal Procedure, I will discuss fully, truthfully, and candidly my knowledge of the events and persons involved in the charges in this case and my knowledge of activities within the Lake County County Court system which corruptly affect the operation of that court system, with agents of the Federal Bureau of Investigation, officers of the Indiana State Police, U.S. Probation officers, and, such other federal and state investigative agencies as may become involved in these matters, and representatives of the United States Attorney's Office. If requested by the Government to do so, I agree to testify truthfully, candidly, completely in Grand Jury proceedings, and any U.S. District Court proceedings. In regard to my testimony either before a Grand Jury or in any other judicial proceeding, including trial, I understand that should I not testify truthfully, that I may be prosecuted for the crime of perjury and this plea agreement would be void. Other than a prosecution for perjury the information I provide the Government will not be the basis of any further proceedings.

The language of this provision is clear and unambiguous and can be summarized as follows: first, Bielak must speak truthfully and completely with all investigators; second, Bielak must testify truthfully and completely during any and all federal, judicial proceedings (including grand jury proceedings and actual trials); and third, should Bielak fail to testify truthfully during any federal, judicial proceeding, he would be liable for perjury and the plea agreement would be void. Significantly ab-

sent from this provision is any mention of what is to happen if Bielak fails to speak truthfully with investigators. By the very terms of their contract, the parties have expressly limited the remedy of voiding the contract to the specific situation where Bielak is untruthful during a federal, judicial proceeding.[4]

As discussed earlier in this Order, the Government demonstrated by a preponderance of the evidence that defendant Bielak failed substantially to comply with the terms of his plea agreement by being untruthful *either* to the grand jury *or* to investigators. The Government has not made any attempt to demonstrate that Bielak lied to the grand jury,[5] and, according to the explicit terms of subparagraph (e), that is what is required to void the agreement.

■ Plea agreements are contractual in nature and are subject, to a certain extent, to principles of contract law. *Fields*, 766 F.2d at 1168; *Mooney*, 654 F.2d at 486. One of the basic precepts of contract law is that a court must give effect to the clear and unambiguous terms of a contract when construing it. 3 A. Corbin, *Corbin on Contracts* § 535 (1960 & Supp.1984); *see also Ohio Casualty Group of Insurance Companies v. Gray*, 746 F.2d 381, 383 (7th Cir.1984). The terms of subparagraph (e) of Bielak's plea agreement are manifestly clear—the contract can be voided only when Bielak has testified untruthfully during some federal, judicial proceeding.

■ Although contract principles are helpful, they are not determinative in cases involving plea agreements. *Calabrese*, 645 F.2d at 1390; *see also Fields*, 766 F.2d at 1168–69. "Because important due process rights are involved, plea negotiations must accord a defendant requisite fairness and be attended by adequate 'safeguards to insure the defendant what is reasonably due [in] the circumstances.'" *Calabrese*, 645 F.2d at 1390 (quoting *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971)). The Seventh Circuit has found that one safeguard necessary to protect a defendant's rights is the "[G]overnment's resultant duty to use special care in their drafting." *Fields*, 766 F.2d at 1168. In fact, the Government is to be held to the literal terms of a plea agreement. *United States v. Benchimol*, 471 U.S. 453, 105 S.Ct. 2103, 85 L.Ed.2d 462 (1985) (per curiam) (a party's rights under a plea agreement are limited by what the parties in fact agreed to and courts are not to imply terms which the parties themselves did not agree upon); *Fields*, 766 F.2d at 1168 ("[The Government] may reach port in the plea bargaining process but founder there because of careless or loose language in its commitment. Once it makes a promise, *Santobello* [*v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ] requires strict adherence.") (quoting *United States v. Crusco*, 536 F.2d 21, 26 (3d Cir.1976)); *United States v. Travis*, 735 F.2d 1129, 1132 (9th Cir.1984); *United States v. Mack*, 655 F.2d 843, 847 (8th Cir.1981) ("[t]here is no doubt that the *essential terms* of a plea agreement, once reached, must be honored by the prosecution") (emphasis in original); *United States v. Avery*, 621 F.2d 214, 216 (5th Cir.1980) (the Government must adhere strictly to

---

**4.** The court observes that subparagraph (f) also provides for nullification of the agreement in the event Bielak fails to pass a polygraph examination. Subparagraph (f) provides:

> (f) Should the Government request me to do so, I agree to submit myself to a polygraph examination concerning the truthfulness of the information and testimony given by me under the terms of his plea agreement, such examination to be conducted by an examiner chosen by the Government, with costs to be borne by the Government. I further agree that should the results of such an examination indicate that I have not been truthful in regard to the information and testimony I have

given, the Government will so notify me, and the Government is free to declare this plea agreement null and void, and may proceed to trial against me on all counts named in HCR 85–23.

The Government has not asserted that Bielak breached this provision of the plea agreement.

**5.** In fact, the Government's petition to vacate the plea agreement asserts in paragraph six that: "[Bielak's] failure to cooperate truthfully and candidly with investigators and/or his failure to testify truthfully and candidly before a Federal Grand Jury is a material breach of the plea agreement previously accepted by this Court."

the terms and conditions of the plea agreement).

▮ In cases where a court has voided a plea agreement because of a defendant's breach, the various agreements contained a catch-all clause stating, in essence, that if the defendant failed to fulfill all of his obligations under the agreement the Government would be free to reindict him. *See e.g., Wood,* 780 F.2d at 930 (agreement provided that if the defendant "should fail in any way to fulfill completely each and every one of his obligations, then the Government will be free from its obligations to [him]"); *Calabrese,* 645 F.2d at 1389–90 (agreement providing that the defendant "understands and agrees that if he wilfully fails to comply with any part of this agreement, or if he fails to tell the complete and entire truth as to any material matter to agents or attorneys for the United States, or if he fails or refuses to testify truthfully as to any material matter in any Grand Jury or trial proceeding, this agreement is null and void, [and] all charges can and will be brought against him"); *Stirling,* 571 F.2d at 732 (agreement provided "[s]hould it be judged by the [United States Attorney's] office that [the defendant] has . . . violated any provision of this agreement, this agreement shall be null and void and [the defendant] shall thereafter be subject to prosecution for any federal criminal violation"). *Cf. Verrusio,* 803 F.2d at 890 n. 3 (suggesting that the Government provide a defendant an opportunity to correct his breach before reindicting him). In drafting the present plea agreement, the Government and Bielak did not include such an allncompassing provision.[6] Given the literal terms of the agreement presently at bar, the court concludes that the Government is not entitled to have the agreement vacated.

### III.

### CONCLUSION

For the foregoing reasons, the court ORDERS that the Government's Petition to Vacate Plea Agreement and Reinstate Indictment is hereby DENIED.

---

6. The court observes that the Government's problem in the present case may be more of timing rather than drafting. When reading subparagraph (e) in conjunction with subparagraph (f), it is apparent that the Government anticipated the possibility that Bielak might lie to investigators. Subparagraph (f) requires Bielak to take a polygraph examination concerning the truthfulness of the information and testimony he provides and, should he fail such an examination, the Government is free to have the agreement declared null and void and to reindict Bielak. The Government is simply premature in asking the court to void the agreement on the basis of the evidence it has presented.

Nevertheless, the Government should take greater care in negotiating future plea agreements and should include a clear statement that the giving of false information or testimony will vitiate all reciprocal obligations on the part of the Government. *United States v. Dailey,* 759 F.2d 192, 200–01 (1st Cir.1985); *see also United States v. Reckmeyer,* 786 F.2d 1216, 1224 n. 9 (4th Cir.1986).