UNITED STATES of America, Plaintiff,

v.

Martin FELICIANO, Defendant.

No. 91 CR 008–3.

United States District Court,
N.D. Illinois, E.D.

March 27, 1992.

Rocco J. de Grasse, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Sheldon Nagelberg, Chicago, Ill., for E. Torres.

Christopher W. Graul, Stanley L. Hill & Associates, P.C., Chicago, Ill., for I. Correa.

John M. Cutrone, Chicago, Ill., for L. Rodriguez.

Marvin Bloom, Chicago, Ill., for M. Feliciano.

Daniel S. Alexander, Chicago, Ill., for C. Diaz.

Carl P. Clavelli, Chicago, Ill., for J. Ortiz.

## MEMORANDUM OPINION
## AND ORDER

ALESIA, District Judge.

Now before the court is the government's motion to vacate defendant Martin Feliciano's ("Feliciano") plea agreement, pursuant to *United States v. Verrusio*, 803

F.2d 885 (7th Cir.1986). On February 3, 1992, the court held an evidentiary hearing at which time the government presented evidence.[1] The court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

The court, based upon the credible evidence of record after an evidentiary hearing, makes the following Findings of Fact:

1. Defendant Feliciano was indicted along with co-defendants Edwin Torres, Ivan Correa, Carlos Diaz (also known as "Tonito") and Jose Ortiz. The defendants were charged with conspiring to possess with intent to deliver, and actual possession with the intent to deliver more than five kilograms of cocaine. The defendants were arrested on January 3, 1991 after undercover agents conducted a undercover "buy" at Correa's apartment on 2543 North Springfield, Chicago, Illinois. (Tr. 7–12, 17)[2]

2. Prior to entering into a plea agreement with the government, Feliciano made several proffer statements to the government detailing his, and his co-defendants', involvement with the criminal conspiracy. These statements were made in two meetings with the government on July 18 and July 25 of 1991. (Tr. 75) The purpose of these proffer meetings was to determine whether the government and Feliciano would pursue a plea agreement. (Tr. 75–76)

3. At the July 18 proffer meeting, Feliciano gave the following version of events: On January 3, 1991, Feliciano received a "beep" on his personal beeper from co-defendant Correa. (Tr. 75–76) Upon contacting Correa, Correa told Feliciano to come over to Correa's apartment, which Feliciano did. (Tr. 79) Correa's apartment was located at 2543 North Springfield in

Chicago. (Tr. 82) Upon meeting with Correa, and at Correa's request, Feliciano drove to an apartment on Harding Street to pick up Correa's drug source "Ronnie"[3] and obtain a quantity of cocaine. (Tr. 76) Feliciano returned to Correa's apartment with between five and six kilograms of cocaine, and was met by Correa who brought a portion of the cocaine into his apartment. Also present in Correa's apartment at the time was co-defendants Diaz. Correa and Feliciano disagreed as to how to conduct the drug transaction with the undercover agent, Rafael Tovar ("Tovar"), who was posing as the buyer. (Tr. 77) Eventually, Feliciano left the apartment and requested Tovar and Ortiz to enter the apartment to complete the transaction. (Tr. 77) Feliciano then went to another apartment in the building to visit several of Correa's relatives. (Tr. 77) Later, Correa again "beeped" Feliciano who then returned to Correa's apartment. (Tr. 78) Correa and Feliciano then retrieved the remaining five kilograms of cocaine from Feliciano's car and re-entered Correa's apartment to complete the cocaine transaction with Tovar. (Tr. 78)

4. At his July 18 proffer meeting, Feliciano stated he was not present in the apartment during the time co-defendants Correa, Diaz and Ortiz and undercover agent Tovar tested a one-kilogram brick of cocaine. (Tr. 78)

5. Following the July 18 proffer meeting, the government determined that Feliciano's version of events differed from Tovar's version. (Tr. 81) Tovar testified at the hearing that Feliciano was present when Tovar inspected the one-kilogram package of cocaine. (Tr. 13–14) Tovar further stated that Diaz, Correa and Ortiz were also present at that time and that Feliciano had witnessed Diaz and Tovar

---

1. The defendant elected to not put on any witnesses or introduce any exhibits. Both the defendant and government have filed proposed findings of fact and conclusions of law. The government requests that it be allowed oral argument on the issues presented by the hearing. Given that the court is ruling in the government's favor, no argument is necessary.

2. References to "Tr." are to transcript pages of the hearing held on February 3, 1992.

3. This individual has never fully been identified to the court.

comment on whether the one-kilogram package might be a fake. (Tr. 14)

6. A second proffer meeting was held on July 25, 1991. At this proffer meeting, Feliciano's version of events was similar, but not identical, to the version given at the July 18 proffer meeting. Feliciano's version at the second proffer meeting differed in several relevant respects:

a. Feliciano stated that after leaving Correa's apartment to go upstairs to see Correa's relatives, a male adult was present at the upstairs apartment. (Tr. 83)

b. Feliciano stated that contrary to his statement at the July 18, 1991 proffer meeting, when Feliciano arrived at Correa's apartment having already met with "Ronnie", Feliciano, and not Correa, brought the cocaine into Correa's apartment. (Tr. 84, 85)

c. Feliciano stated that he was present when Tovar, Correa, Diaz and Ortiz inspected a one-kilogram package of cocaine. (Tr. 84) Feliciano stated he could not remember what happened to the one-kilogram package of cocaine after Tovar had inspected it. (Tr. 84)

7. Feliciano and the government entered into a plea agreement on July 31, 1991. In return for Feliciano's guilty plea, the government agreed to recommend to the court a sentence of two-thirds of the guideline range, or 80 months. Plea Agreement, ¶ 14.

8. As part of the plea agreement, Feliciano acknowledged the underlying facts of the drug conspiracy. Feliciano also acknowledged:

Correa led Agent Tovar to a bedroom in which a one kilogram package of cocaine was stored. Feliciano and Ortiz were present in or near the bedroom at this time. Co-defendant Carlos Antonio Diaz was present in the bedroom. Agent Tovar, Feliciano, Correa, Diaz and Ortiz then walked into the apartment's kitchen

where Tovar inspected the package with a knife supplied by Correa.

Plea Agreement, at ¶ 5(a).

9. As part of the plea agreement, Feliciano agreed to "fully cooperate with the government in any investigation in which he is called upon to cooperate that is related to or result from the charges in this case." Plea Agreement, at ¶ 12. Feliciano also agreed to "provide complete and truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding." Plea Agreement, at ¶ 12. Feliciano stated in open court, during his change of plea hearing, that he understood paragraph 12 of the plea agreement and agreed to abide by it. *See* Government Exhibit 3, Transcript of Proceedings before Judge Alesia on July 31, 1991, at 11.

10. Feliciano acknowledged in his plea agreement that "compliance with each part of this plea agreement extends throughout and beyond the period of his sentence, and failure to abide by any term of the plea agreement is a violation of the agreement rendering it null and void." Plea Agreement, at ¶ 15.

11. Following Feliciano's guilty plea, the government met with Feliciano to prepare him as a witness at the trial of Feliciano's co-defendants. During this meeting, which took place on August 2, 1991, Feliciano was questioned by Assistant United States Attorney Rocco deGrasse concerning the inconsistency in Feliciano's version of event. Feliciano's version changed several times while being questioned by deGrasse. (Tr. 87–92) We quote the transcript of deGrasse's testimony, which the court finds credible.[4]

Q. Did you discuss with him in this meeting whether or not he [Feliciano] was present in the apartment when Agent Tovar inspected the kilogram of cocaine?

A. [deGrasse] Yes. We got to that point. Again, as he had earlier and this is previous to the briefings, he indicated he went and got the cocaine once Tovar left and brought it back. He then said at

**4.** The court will make separate credibility findings *infra*.

this point in time when he brought the cocaine back, he spoke with Tovar about coming back into the apartment, he was nervous. At that point he again repeated at some point shortly thereafter, he repeated his assertion that he was not present in the apartment when Tovar looked at the cocaine....[5]

Q. Did he, during this third conversation, did he say anything about Mr. Diaz?

A. During this third conversation he said that he could not—and the first time we went through it, as this initial development came about, that he was not present when Tovar looked at the one kilogram sample of cocaine. He stated that he could not tell me whether Diaz was or was not present because he wasn't there.

(Tr. 87–88) Later in this meeting, after Feliciano spoke with his attorney, Feliciano's version again changed:

Q. What did you say to Mr. Feliciano and what did he say to you after he had spoken on the phone with Mr. Bloom [Feliciano's defense counsel].

A. [deGrasse] I asked him if he was now prepared to proceed, and whether things had been clarified for him. He said he was ready to proceed. He then stated that he had been in the apartment, the kitchen of the apartment, the first-floor apartment. And he had seen Tovar inspect the package of cocaine in the kitchen apartment, in Diaz's presence.

(Tr. 89) deGrasse then pointed out to Feliciano that his version of events had changed during the course of their meeting.

Q. That is what you were saying to Mr. Feliciano?

A. [deGrasse] Yes, sir.

Q. What did Mr. Feliciano say in response to that?

A. He said he was telling me the truth—at that point he was troubled. He looked troubled. I asked him just to tell me the truth. That his cooperation paragraph required him to tell me the truth and that I just wanted to know what the truth was. I didn't want him to tell me what I thought he wanted me to

hear. I just wanted him to give me what he actually saw.

Q. What did he say then?

A. He said, truthfully he wasn't in the apartment when Tovar inspected the one kilogram package of cocaine.

(Tr. 90) Again Feliciano was put in telephone contact with his defense counsel. Following this conversation, deGrasse continued his questioning:

Q. Once Mr. Feliciano had finished speaking with Mr. Bloom did you have further conversation with him?

A. [deGrasse] Yes, I spoke briefly with Mr. Bloom. I hung up the phone and then I asked Mr. Feliciano again, advising him to be very, very certain of what he was telling me what happened.

Q. What did he say then?

A. He shrugged his shoulders. He looked at me and said, I was there. He just threw up his hands. I was there, I saw the whole thing.

Q. Did you have further conversation with him?

A. Yes. I was not comfortable with that rendition. I can only say it didn't appear to me that he was comfortable with that. So he seemed to be very frustrated. So at that point in time I spoke to him for about five minutes about the danger in what he was doing for his own sake because the story had changed several times now on one day. That I just wanted the truth and that I couldn't really spend much more time. I wanted him once and for all to tell me actually what happened, and that this was the last time that I was going to go through this I didn't have anymore time.

Q. What did he say then?

A. He looked at me. I could see he was somewhat shaken and said, I am telling you, I swear to you, this is the truth, I wasn't there. I didn't see it.

(Tr. 91–92) Following this statement by Feliciano, the meeting between deGrasse and Feliciano ended.

---

**5.** The remainder of this sentence was stricken after objection by Feliciano's defense counsel.

12. Feliciano agreed to submit to a polygraph examination. During the polygraph examination, which took place on September 11, 1991, Feliciano stated that he was not present when Tovar inspected the one-kilogram package of cocaine. (Tr. 67, 71)

13. The court has examined the transcript recounting Feliciano's statements to the government. The court has only one explanation for the variations among Feliciano's version of events. Feliciano, during the course of his meetings with the government, gave two diametrically opposite versions of events concerning Tovar's testing of cocaine in the kitchen of Correa's apartment. One or both of the versions was untrue. The court makes as its finding of fact that Feliciano made false statements to the Assistant United States Attorney Rocco deGrasse, when Feliciano met with deGrasse on July 18, July 15, and August 2, 1991.

14. During the course of the hearing, the court has had the unique opportunity to observe the demeanor of the witnesses while testifying to the events giving rise to this dispute and to weigh the credibility of those witnesses. Based upon these observations, the court makes the following credibility determinations:

a. Rafael Tovar testified on behalf of the government. Tovar is employed by the Des Plaines Police Department and is assigned to the Northeastern Metropolitan Enforcement Group. The court found Tovar's testimony forthright, clear, consistent, and entirely credible.

b. Wilma Correa ("Wilma") testified on behalf of the government. Wilma is defendant Ivan Correa's niece. Wilma lived with Ivan and Wanda Correa at the apartment at 2545 Springfield, Chicago, Illinois. Wilma was at the apartment during the time Feliciano allegedly left the downstairs apartment at 2543 Springfield and went up to visit with Ivan Correa's children at the 2545 Springfield apartment. (Tr. 37–42) The court found Wilma's testimony generally credible, but at times inconsistent. Wilma had some problems remembering the timing of the events which occurred on January 3, 1991. (Tr. 42, 45, 49 & 52) Also, there were some inconsistencies between Wilma's testimony at the hearing and what Wilma told government investigators. (Tr. 53)

c. Wanda Correa ("Wanda") testified on behalf of the government. Wanda is the defendant Ivan Correa's wife. Wanda lived with Ivan Correa at the apartment at 2545 Springfield, Chicago, Illinois. (Tr. 55) The court found Wanda's testimony generally consistent and credible. Wanda did have some problems remembering the details of events on January 3, 1991. (Tr. 57)

d. Jeffrey Behrmann testified on behalf of the government. Behrmann is a special agent with the United States Drug Enforcement Agency ("DEA"). Behrmann's specialty with the DEA is polygraph examinations. Behrmann administered a polygraph examination to Feliciano on September 11, 1991. The court found Behrmann's testimony forthright, clear, consistent, and entirely credible.

e. Rocco deGrasse testified on behalf of the government. deGrasse is an Assistant United States Attorney who was assigned to the prosecution of the criminal case against Feliciano and his co-defendants. The court found deGrasse's testimony forthright, clear, consistent, and entirely credible.

## II. CONCLUSIONS OF LAW

1. A plea agreement is a contract. *United States v. Ataya,* 864 F.2d 1324, 1329 (7th Cir.1988); *United States v. Verrusio,* 803 F.2d 885, 887 (7th Cir.1986); *United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985).

2. A prosecutor's promise within a plea agreement must be fulfilled. *Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971). A defendant's failure to fulfill the terms of a plea agreement relieves a prosecutor's reciprocal obligations under the agreement. *Verrusio,* 803 F.2d at 888; *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir. 1981), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1982).

3. A defendant is entitled to a pretrial hearing under the due process clause to determine if, in fact, a breach of a plea agreement has occurred. *Ataya*, 864 F.2d at 1330; *Verrusio*, 803 F.2d at 888–89. The purpose of the hearing is to determine whether the defendant has substantially breached the plea agreement in light of the parties' reasonable expectations. *Ataya*, 864 F.2d at 1330; *United States v. Bielak*, 660 F.Supp. 818, 824 (N.D.Ind.1987).

4. The government has the burden of showing, by a preponderance of the evidence, that a defendant substantially breached his plea agreement. *Verrusio*, 803 F.2d at 890–92, 894; *Bielak*, 660 F.Supp. at 820. *Cf. United States v. Wood*, 780 F.2d 929, 931–32 (11th Cir.), *cert. denied*, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986).

5. The government is to be held to the literal terms of the plea agreement. *Ataya*, 864 F.2d at 1330; *Bielak*, 660 F.Supp. at 826. However, "[w]hile the 'most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining, ...' not every dispute arising over the meaning of a plea agreement must be construed against the government, for 'disputed terms ... are to be determined by the district court by objective standards.'" *Ataya*, 864 F.2d at 1330–31 (quoting *United States v. Bowler*, 585 F.2d 851, 854 (7th Cir.1978) and *United States v. Strawser*, 739 F.2d 1226, 1230 (7th Cir.1984)). A plea agreement must be viewed "'in light of the parties' reasonable expectations' upon entering the agreement." *Ataya*, 864 F.2d at 1330 (quoting *Fields*, 766 F.2d at 1168).

6. In order for the government to sustain its burden, the government must first show that Feliciano has breached a provision of the plea agreement. Next, if the government shows that Feliciano has breached the plea agreement, the government must show that the breach was substantial. Finally, having shown that Feliciano has breached the plea agreement, the government must show that it seeks the appropriate remedy. *See Bielak*, 660 F.Supp. at 820–24.

7. The government has shown, by a preponderance of the evidence, that Feliciano has breached the plea agreement. The cooperation paragraph in the plea agreement (¶ 12) states that Feliciano agreed "to cooperate with the government in any investigation in which he is called upon to cooperate that is related to or results from the charges in this case." Feliciano has clearly failed to cooperate with the government. Feliciano repeatedly provided a conflicting account of whether he was present when Tovar inspected the one-kilogram package of cocaine with co-defendants Diaz, Ortiz and Correa. The court concludes that it was in the reasonable expectation of the government that Feliciano would give a truthful account of the events underlying the drug conspiracy. Moreover, Feliciano could reasonably assume that the government agreed to Feliciano's plea agreement because the government wished to use Feliciano as a witness against one or more of the defendants. *Cf. Ataya*, 864 F.2d at 1331 ("defendant's cooperation in any proceeding or investigation related to his counterfeiting operations was undoubtedly part of the government's 'reasonable expectations' in entering the agreement...."). The court concludes that Feliciano, by not providing a truthful account to the government of the events of January 3, 1991, has breached paragraph 12 of the plea agreement.

8. The court also concludes that, by providing a false version of events during his meetings with the government, Feliciano has substantially breached paragraph 12 of the plea agreement. Feliciano's testimony was a key component of the government's case against Feliciano's co-defendants, especially Diaz. When the government agreed to enter into a plea agreement with Feliciano, the government was entitled to expect that Feliciano's cooperation would include truthful statements on Feliciano's part. The government was also entitled to expect that after receiving Feliciano's cooperation in investigating the case against his co-defendant, the government could rely on Feliciano to testify truthfully before this court during the prosecution of

the case against Feliciano's co-defendants. Feliciano's false statements made his availability as a witness useless to the government. The government was not required to call Feliciano at trial to see if he would tell the truth. *Cf. United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir.1985) (government not required, prior to reindictment of defendant, to call defendant to testify before grand jury when all indications were that he would not tell the truth). By making himself useless as a witness to the government, Feliciano contravened both the express terms and the underlying expectations of paragraph 12 of the plea agreement. *See also United States v. Britt,* 917 F.2d 353, 357–58 (8th Cir.1990) ("if defendant is not completely truthful in the information he gives to law enforcement agents, 'all obligations imposed on the government by this agreement will be rendered null and void....' "), *cert. denied,* —— U.S. ——, 111 S.Ct. 971, 112 L.Ed.2d 1057 (1991); *United States v. Gonzalez–Sanchez,* 825 F.2d 572, 579 (1st Cir.) (failure to cooperate and testify truthfully a "material" breach of plea agreement), *cert. denied sub nom., Latorre v. United States,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987).

■ 9. Paragraph 15 of the plea agreement contains unambiguous language which provides a remedy in the event Feliciano breached the plea agreement. The agreement provides that Feliciano's failure to abide by any term of the agreement constitutes a violation rendering the agreement null and void. *Cf. Bielak,* 660 F.Supp. at 825–27. The court concludes that paragraph 15 should be enforced as the remedy for Feliciano's substantial breach of his plea agreement.

## III. CONCLUSION

The government's motion to vacate Feliciano's plea agreement, pursuant to *United States v. Verrusio,* is GRANTED. It is ordered that the plea agreement between the United States and Martin Feliciano is VACATED. Because this court presided over Feliciano's entry of a guilty plea, the trial of Feliciano's co-defendants, and now the vacating of Feliciano's plea agreement, the court recuses itself from any further proceedings involving Feliciano. The case of *United States v. Martin Feliciano,* 91 CR 008–3, will be referred to the Executive Committee for reassignment to another judge.