**UNITED STATES of America, Plaintiff–Appellant,**

v.

**Amin ATAYA, Defendant–Appellee.**

No. 87–2858.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 7, 1988.

Decided Dec. 14, 1988.

---

David J. Stetler, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellant.

Kenneth L. Cunniff, Chicago, Ill., for defendant-appellee.

Before WOOD, Jr. and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

In this appeal we are presented with the task of interpreting the terms of a plea agreement; namely, whether the defendant, Amin Ataya, breached the cooperation clause in his plea agreement and is therefore subject to reindictment on a charge previously dismissed pursuant to that agreement. We find that the defendant breached his plea agreement and accordingly vacate the order of the district court dismissing the superseding indictment.

### I.

The defendant, Amin Ataya, and a co-defendant, Mustafa Syammach, were arrested on June 11, 1986, and subsequently indicted by the United States in three counts. Count One of the indictment charged the defendant with conspiring to make and deliver counterfeit obligations in violation of 18 U.S.C. § 371; Count Two charged the defendant with making counterfeit obligations in violation of 18 U.S.C. § 471; and Count Three charged the defendant with delivering counterfeit obligations in violation of 18 U.S.C. § 473.[1]

Prior to trial, the defendant entered into a plea agreement in which he agreed to plead guilty to Counts One and Three of the indictment (the conspiracy and delivery charges) in return for one-year of imprisonment on Count One and a five-year unsu-

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. The defendant's delivery of approximately $8,500.00 in counterfeit one hundred dollar ($100) Federal Reserve Notes forms the bases for the charges in this case.

pervised probation on Count Three. The defendant also agreed to admit his alien status and to submit to deportation proceedings. The government, in turn, promised that it would move to dismiss the remaining count of the indictment (Count Two) after the defendant had been sentenced. The instant dispute surrounds the defendant's obligations under the plea agreement as set forth in the following provisions:

11. The defendant agrees he will cooperate fully with the government in any investigation in which he is called upon to cooperate that is related to or results from the charges in this case. Defendant agrees to provide complete and truthful information to government investigators, including truthful testimony, if called upon to testify, before any federal grand jury and United States District Court proceeding.

12. Specifically, defendant agrees to testify on behalf of the government in the case of *United States v. Mustafa Syammach*, 86 CR 462, currently pending before Judge Paul E. Plunkett.

On September 25, 1986, the defendant entered a plea of guilty to Counts One and Three of the indictment pursuant to the plea agreement. Judge Plunkett questioned the defendant as required by Rule 11 of the Federal Rules of Criminal Procedure,[2] including the following exchange with regard to paragraphs 11 and 12:

**2.** Rule 11 provides, in pertinent part:
   (c) Advice to Defendant. Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
   (1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum possible penalty provided by law, including the effect of any special parole term and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense;

   *       *       *       *       *       *

   (d) Insuring That The Plea is Voluntary. The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determin-

THE COURT: You [the defendant] said in paragraph 11, the next paragraph, that you will agree and you have agreed to cooperate fully with the government in any investigation in which they call upon you to cooperate that is related to or results from the charges contained in this case, is that right?

THE DEFENDANT: Yes, Your Honor.

   *       *       *       *       *       *

THE COURT: So you basically have agreed that if there is a trial here, either Monday or some day thereafter, to come in and testify against Mr. Syammach and tell the jury and me all about what happened in this case, and do so truthfully, is that right?

THE DEFENDANT: Yes, Your Honor.

In accepting the defendant's plea of guilty to Counts One and Three of the indictment, the district court determined that the plea was made knowingly and voluntarily, *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987),[3] and set November 13, 1986, as the sentencing date.

The defendant initially complied with the terms of the plea agreement by cooperating with the government in the prosecution of his co-defendant, Mustafa Syammach. The defendant met with Assistant United States Attorney (AUSA) Patrick Foley prior to trial to prepare his testimony and, at trial, served as the principal witness for the prosecution. Mr. Syammach was convicted of conspiracy in violation of 18 U.S.C.

ing that the plea is voluntary and not the result of force or threats or of promises apart from the plea agreement....
Fed.R.Crim.P. 11(c)(1), (d).

**3.** The questioning conducted by Judge Plunkett at the plea hearing complied fully with the requirements of Rule 11 and the defendant does not contend otherwise. The court made an independent determination that there was a factual basis for the plea, that the conduct admitted to by the defendant constituted the offenses charged in the indictment, and that the defendant understood both the nature of the charges and the consequences of his guilty plea. *See Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McCarthy v. United States*, 394 U.S. 459, 464–67, 89 S.Ct. 1166, 1169–71, 22 L.Ed.2d 418 (1969); *United States v. Ellison*, 835 F.2d 687, 689 (7th Cir.1987).

§ 371, but was acquitted on the substantive counts of making and delivering counterfeit obligations. 18 U.S.C. §§ 471, 473.

On November 13, 1986, the district court sentenced the defendant in accordance with the plea agreement and dismissed Count Two of the indictment upon oral motion by the United States pursuant to its obligations under the agreement.

Prior to the November 18 sentencing of co-defendant Syammach, defense counsel for Mr. Syammach requested the production of additional notes from government agents. Included in these materials was exculpatory evidence that had not been turned over to the defense as required by 18 U.S.C. § 3500 and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).[4] Judge Plunkett reviewed the evidence *in camera* and, at a December 1

hearing, requested that the government reexamine its case against Mr. Syammach.

■ In light of the misgivings expressed by the district court, the government met with the defendant on December 8, 1986, to reexamine the evidence against Mr. Syammach. Although defense counsel was present at the onset of the interview, the government questioning of the defendant continued thereafter in counsel's absence but with his consent.[5] The defendant's responses on December 8 were consistent with his trial testimony, and a second meeting was arranged for the next day to complete the reevaluation of the government's evidence against Mr. Syammach. At the end of the December 8 meeting, AUSA Foley advised the defendant of the possibility of a retrial for Mr. Syammach.

**4.** The exculpatory evidence withheld from Mr. Syammach consisted of notes taken by the Secret Service Special Agent assigned to the case. The case agent's notes indicated that Mr. Syammach went to the local police with information regarding the defendant's counterfeiting activities well before his arrest on June 11, 1986. Insofar as this evidence went directly to Mr. Syammach's state of mind, the evidence was material, *United States v. Agurs,* 427 U.S. 97, 112–114, 96 S.Ct. 2392, 2401–03, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 86–88, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), and the defense was entitled to examine the material so as to make effective use of the material as required by *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

**5.** The government seeks to justify its practice of questioning defendants who are cooperating in ongoing investigations without counsel present on the ground that the defendant is no longer in a position adverse to that of the government, but we share the district court's unease over the practice.

It is well-settled that "[w]hatever else it may mean, the right to counsel granted by the Sixth and Fourteenth Amendments means at least that a person is entitled to the help of a lawyer at or after the time that judicial proceedings have been initiated against him—'whether by way of formal charge, preliminary hearing, indictment, information or arraignment.'" *Brewer v. Williams,* 430 U.S. 387, 398, 97 S.Ct. 1232, 1239, 51 L.Ed.2d 424 (1976) (quoting *Kirby v. Illinois,* 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)). While a defendant such as Mr. Ataya may not be in an adversarial position with respect to the government at the moment questioning begins, neither is he so far removed from the formal criminal process that it may be reasonably said of him that he is entirely outside the bounds of "adversary criminal proceedings." *Kirby,* 406 U.S. at 689, 92 S.Ct. at 1882. Such a defendant has typically been arrested, indicted, and pled guilty to a criminal offense, with the possibility of further prosecution for the same activity which gave rise to his original plea if he breaches his plea agreement. It is clear from the facts of this case that statements made by a defendant during these interviews might be used by the government to allege a breach of the plea agreement. Once a breach has been alleged, the parties once more assume an adversarial posture. The fact that a defendant may be reindicted prior to a judicial determination that a breach has occurred without committing another *criminal* act must heighten one's sense that the cooperating defendant is in a peculiar position in the criminal process. Such a defendant faces the imminent possibility that formal criminal judicial proceedings will result and seems to call for the presence of defense counsel during these interviews. Because defense counsel consented to the questioning in this case and because there is no suggestion that the government acted improperly in its questioning of the defendant, we stop short of ruling formally on the matter. We are convinced, however, that a prudent government policy would require defense counsel to remain present throughout any and all questioning in which a defendant is similarly at risk. Quite apart from the significant sixth Amendment interests at stake, the district court was correct in noting that "[s]uch a practice is fraught with the danger that the government will be accused of overreaching." *Ataya,* 672 F.Supp. 1096, 1097 n. 3 (N.D.Ill.1987).

Shortly into the meeting on December 9, the defendant indicated that Mr. Syammach "had not done anything. . . ."[6] Foley replied that if Syammach had indeed done nothing in connection with the defendant's counterfeiting operations, the defendant's testimony at trial constituted perjury, to which the defendant responded "So be it." As Foley pursued the matter, the defendant retracted his prior statement that Syammach "had not done anything," contending that his trial testimony had been truthful, but refused to cooperate further with the government.

Foley contacted defense counsel and advised him of the situation. Counsel arrived at the government offices and, after conferring with the defendant, informed Foley that the defendant did not wish to testify at a second trial. At a meeting with AUSA Ferguson, the defendant reiterated his claim that he had testified truthfully at trial, but refused to testify a second time. Ferguson told the defendant that such a refusal would constitute a breach of the plea agreement. The defendant replied "Fine," and the meeting ended.

Later that day, AUSA Foley received a telephone call from defense counsel indicating that the defendant would now testify at a retrial.

Foley met with the defendant on December 11, 1986, but once again, the defendant advised Foley that he would not testify at a retrial. Foley contacted defense counsel, with still another meeting between Foley, Ferguson, the defendant, defense counsel, and the case agent.

As at the meeting on December 9, AUSA Ferguson informed the defendant that his refusal to testify constituted a breach of the plea agreement and that the government would act to remedy its rights under the plea agreement, but the defendant remained adamant in his refusal to testify at the retrial of Mr. Syammach.

The defendant was reindicted in one count for making counterfeit obligations in violation of 18 U.S.C. § 471 on March 20, 1987. After pleading not guilty to the charge contained in the superseding indictment, the defendant filed a motion to dismiss the indictment on May 20, 1987. Judge Plunkett recused himself, and the case was assigned to Judge Duff, who conducted hearings on the matter over four days in July of 1987, and, on November 5, 1987, issued a memorandum opinion granting the defendant's motion to dismiss the indictment. The United States filed a timely notice of appeal pursuant to 18 U.S.C. § 3731.

## II.

The defendant contends that the obligations imposed in paragraph 11 are ill-defined, and, insofar as the language in the agreement is ambiguous, the agreement must be construed against the drafting party, *i.e.*, the government. Restatement (Second) of Contracts §§ 206, 207 comment a (1981). This Court has repeatedly criticized ambiguous provisions in plea agreements, *see, e.g., United States v. Fields,* 766 F.2d 1161, 1168 (7th Cir.1985); *United States v. DeMichael,* 692 F.2d 1059, 1062–63 (7th Cir.1982); *United States v. Bowler,* 585 F.2d 851, 854 (7th Cir.1978), and, in granting the defendant's motion to dismiss the superseding indictment, the district court quoted our language observing that "[t]he Government may not rely on favorable judicial construction to cure significant ambiguities in its plea agreements." *United States v. Ataya,* 672 F.Supp. 1096, 1098 (N.D.Ill.1987) (quoting *United States v. Cook,* 668 F.2d 317, 321 (7th Cir.1982)).[7]

---

**6.** We reject the defendant's strained argument that his statement on December 9 was consistent with his trial testimony. Although conspiring to make and deliver counterfeit obligations does not rise to the level of conduct required to commit the substantive offenses, neither does it entail the sort of innocence implied by the defendant's remark that Mr. Syammach "had not done anything. . . ."

**7.** Because this Court does not find the instant plea agreement to be ambiguous, we do not reach the question of whether a "significant" ambiguity in a plea agreement is one that is very ambiguous or one that is ambiguous with respect to a significant provision in the agreement.

While acknowledging that the interpretation proffered by the government was reasonable, the district court maintained that "another interpretation, adequately supported by the facts of this case and the evidence presented at the *Verrusio* hearing, is that paragraph twelve contained the only promise made by Ataya with respect to the giving of testimony." *Ataya,* 672 F.Supp. at 1098. The district court inferred that both parties to the plea agreement anticipated but a single trial for Mr. Syammach, after which the defendant's responsibilities under the agreement would presumably be discharged. As such, the reasonable expectations of the parties upon entering the agreement extended to but a single instance of testifying at the trial of co-defendant Syammach. In support of its position, the district court referred to the following statement by Judge Plunkett at the plea hearing:

> THE COURT: So in a few months you will be able to head on home. I wish you well, Mr. Ataya.

The district court concluded that both Judge Plunkett and the defendant understood the defendant's obligations to be fulfilled upon the completion of the Syammach trial. *Id.* at 1099.

The district court further ruled that the general language contained in paragraph 11 was limited by the unique language employed in paragraph 12.[8] Because "specific provisions override general ones, and ... matters specially drafted by the parties prevail over boilerplate clauses," *id.,* the district court reasoned that the unique and specific requirement that the defendant testify at the trial of his co-defendant was the "only promise made by Ataya with respect to the giving of testimony." *Id.* at 1098. In support of the district court's conclusion, the defendant argues on appeal that the government's use of the word "specifically" to begin paragraph 12 serves as a "grammatical link" between paragraphs 11 and 12, thus making the two paragraphs dependent, one upon the other.

Finally, the district court intimated that any breach that might have occurred was purely anticipatory, and that the government had failed to show that the defendant had substantially breached the plea agreement by a preponderance of the evidence. *Id.* at 1099. The district court closed its opinion by observing that "[w]hile Ataya is not likely to change his mind and testify, this court has found that he acted in good faith, and thus is entitled to stand on his position." *Id.*

### III.

"[I]n recent years [we have] been repeatedly confronted with difficult questions concerning the interpretation and enforcement of plea agreements," *Fields,* 766 F.2d at 1166, and we are once again presented with such a question.

■■■■ This Court has long recognized that a plea agreement is a contract, *United States v. Verrusio,* 803 F.2d 885, 887 (7th Cir.1986); *Fields,* 766 F.2d at 1168; *United States v. Strawser,* 739 F.2d 1226, 1230 (7th Cir.1984), *cert. denied,* 469 U.S. 1038, 105 S.Ct. 518, 83 L.Ed.2d 407 (1984); *Brooks v. United States,* 708 F.2d 1280, 1281 (7th Cir.1983); *United States v. Delegal,* 678 F.2d 47, 50 (7th Cir.1982); *United States v. Mooney,* 654 F.2d 482, 486 (7th Cir.1981), but a contract in which special due process concerns for fairness and the adequacy of procedural safeguards obtain. *Santobello v. New York,* 404 U.S. 257, 261–62, 92 S.Ct. 495, 498–99, 30 L.Ed.2d 427 (1971); *Fields,* 766 F.2d at 1168; *DeMichael,* 692 F.2d at 1062–63; *United States v. Calabrese,* 645 F.2d 1379, 1390 (10th Cir.1981), *cert. denied,* 451 U.S. 1018, 101 S.Ct. 3008, 69 L.Ed.2d 390 (1982); *Cooper v. United States,* 594 F.2d 12, 16 (4th Cir. 1979); *United States v. Bielak,* 660 F.Supp. 818, 826 (N.D.Ind.1987). "[O]ne requisite safeguard of a defendant's [due process] rights is a judicial determination, based on adequate evidence, of a defendant's breach of a plea bargaining agreement. The question of a defendant's

---

**8.** Assistant United States Attorney Foley testified that he was unaware of a similar provision in any other plea agreement.

breach is not an issue to be determined unilaterally by the government." *Calabrese*, 645 F.2d at 1390. *See also Verrusio*, 803 F.2d at 888; *United States v. Simmons*, 537 F.2d 1260, 1261–62 (4th Cir. 1976); *Bielak*, 660 F.Supp. at 825. To this end, this Court has held that a defendant is entitled to a pretrial hearing under the due process clause to determine if, in fact, a breach occurred. *Verrusio*, 803 F.2d at 888–89.[9]

In arriving at its determination, the court must examine whether there has been a "substantial breach" of the plea agreement, *United States v. Wood*, 780 F.2d 929, 931–32 (11th Cir.1986), *cert. denied*, 479 U.S. 824, 107 S.Ct. 97, 93 L.Ed.2d 48 (1986); *Simmons*, 537 F.2d 1261; *Bielak*, 660 F.Supp. at 824, "in light of the parties' reasonable expectations" upon entering the agreement. *Fields*, 766 F.2d at 1168; *Strawser*, 739 F.2d at 1230; *United States v. Travis*, 735 F.2d 1129, 1132 (9th Cir. 1984); *Mooney*, 654 F.2d at 486; *Bielak*, 660 F.Supp. at 825.

▮ We begin our analysis by duly noting that we in no way retreat from or otherwise modify the strict duty imposed on the government to exercise due care in drafting plea agreements and in fully complying with agreements once accepted by a court.[10] *Fields*, 766 F.2d at 1168; *Bowler*, 585 F.2d at 854; *United States v. Crusco*, 536 F.2d 21, 26 (3d Cir.1976); *Bielak*, 660 F.Supp. at 826. The "Government is to be held to the literal terms of the plea agreement," *Bielak*, 660 F.Supp. at 826; *see also Fields*, 766 F.2d at 1168; *Travis*, 735 F.2d at 1132; *Crusco*, 536 F.2d at 26, for the "[s]trict fulfillment of prosecutorial promises emanates as a requirement from the significant consequences of a guilty plea— the waiver of important constitutional rights and the 'adjudicative element' that is inherent in the plea." *Bowler*, 585 F.2d at 853 (citing *Santobello*, 404 U.S. at 262, 92 S.Ct. at 499).[11] In reading the instant plea agreement and reviewing the record at hand, we are nonetheless firmly convinced that the defendant substantially breached an unambiguous provision in the plea agreement accepted by the court on September 25, 1986.

While the "most meticulous standards of both promise and performance must be met by prosecutors engaging in plea bargaining," *Bowler*, 585 F.2d at 854, not every

**9.** While we acknowledge that the due process clause does not require the "judicial determination" to be made prior to reindictment, *Verrusio*, 803 F.2d at 888–89 ("the holding of a pre-indictment hearing is not a constitutional requirement"), the government practice of alleging breach of a plea agreement and reindicting the defendant prior to a hearing gives us pause. As this Court wrote in *Verrusio:* "Perhaps an even better procedure would be a motion by the government for relief from its obligations under the agreement before it proceeds to the indictment stage." *Id.* at 889. We now state our unqualified belief that such a procedure is most proper.

If the government is correct in its belief that the defendant has breached his plea agreement, a judicial determination prior to reindictment imposes a *de minimis* inconvenience on the government. Remembering that the government is required to submit to a judicial determination prior to trial in any event, the timing of the hearing seems to be of little moment. Where good cause exists for immediate reindictment, the government is surely free to do so, for, as we have said, a pre-indictment hearing is not a constitutional requirement. If, however, the defendant is correct in asserting that he has fulfilled his obligations under the agreement,

the government should not be entitled to use the threat of criminal prosecution and, ultimately, imprisonment to achieve through coercion what it could not achieve through voluntary negotiation. A pre-indictment hearing would help prevent precisely the sort of overreaching by prosecutors criticized by this Court and others in the drafting of ambiguous plea agreements, and therefore recommends itself to us as a prudent method of dealing with disputes concerning plea agreements.

**10.** The government is under no legal obligation to perform under a plea agreement until the agreement has been embraced by a court. "A plea bargain standing alone is without constitutional significance; in itself, it is a mere executory agreement which, until embodied in the judgment of a court, does not deprive an accused of liberty or any other constitutionally protected interest." *Mabry v. Johnson*, 467 U.S. 504, 507, 104 S.Ct. 2543, 2546, 81 L.Ed.2d 437 (1984).

**11.** Among the significant constitutional rights waived by a defendant entering a plea of guilty are: the privilege against self-incrimination; the right to trial by jury; and the right to confront witnesses. *McCarthy*, 394 U.S. at 466, 89 S.Ct. at 1170.

dispute arising over the meaning of a plea agreement must be construed against the government, for "disputed terms ... are to be determined by the district court by objective standards." *Strawser*, 739 F.2d at 1230. *See also Fields*, 766 F.2d at 1168; *Travis*, 735 F.2d at 1132; *United States v. Arnett*, 628 F.2d 1162, 1164 (9th Cir.1979); *Johnson v. Beto*, 466 F.2d 478, 480 (5th Cir.1972).

Count One of the three-count indictment charged the defendant with conspiring to make and deliver counterfeit obligations in violation of 18 U.S.C. § 371. Although the indictment named but one co-conspirator, Mustafa Syammach, this Court merely restates the obvious in noting that it is not uncommon for a conspiracy to include more than two members. The government surely intended to secure the defendant's cooperation in proceedings concerning a potential, but as yet unidentified, third conspirator by means of the cooperation clause in paragraph 11. As the government pointed out to the district court, "retrials happen, additional co-defendants are discovered, related proceedings are appropriate...." The defendant's promise to cooperate fully in any proceeding related to his counterfeiting activities was, in all likelihood, no small part of the consideration the government received in return for its agreeing to dismiss Count Two of the indictment and agreeing to the sentence set forth in paragraph 13 of the agreement. The defendant's cooperation in any proceeding or investigation related to his counterfeiting operations was undoubtedly a part of the government's "reasonable expectations" in entering the agreement, *Fields*, 766 F.2d at 1168; *Mooney*, 654 F.2d at 486; *Bielak*, 660 F.Supp. at 825, for "a commitment to cooperate fully, not to give the Government testimony during one trial and then cease it right there ..." encompasses more than the testimony required in paragraph 12.

The facts in the instant case parallel those recently presented to the Supreme Court in *Ricketts v. Adamson*, 483 U.S. 1, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987). In *Ricketts*, a defendant charged with first-de-gree murder entered a plea agreement which provided, in part, that he would "testify fully and completely in any Court, State or Federal, when requested by proper authorities against any and all parties involved in the murder of Don Bolles ...," in return for a sentence on the lesser charge of second-degree murder. 483 U.S. at ——, 107 S.Ct. at 2682, 97 L.Ed.2d at 8. The defendant-respondent testified at the trials of two other individuals, Dunlap and Robinson, each of whom was convicted of first-degree murder. The Dunlap and Robinson convictions were subsequently reversed by the Arizona Supreme Court and the cases remanded for retrial. The government thereafter sought the "respondent's cooperation and testimony in preparation for the retrial of Dunlap and Robinson." 483 U.S. at ——, 107 S.Ct. at 2683, 97 L.Ed.2d at 8. The respondent, through counsel, informed the government that he believed that his obligations under the agreement terminated upon sentencing, and that he would only testify subject to certain specified conditions. The government rejected those conditions, informed the respondent that it considered him to be in breach of the plea agreement, and obtained a new information charging him with first-degree murder. 483 U.S. at ——, 107 S.Ct. at 2682, 97 L.Ed.2d at 9. The respondent was later convicted of first-degree murder, claiming on appeal that the double jeopardy clause of the fifth and fourteenth amendments barred reprosecution for the same conduct. 483 U.S. at ——, 107 S.Ct. at 2684, 97 L.Ed.2d at 10.

The Arizona Supreme Court ruled that the respondent had breached the terms of his plea agreement and that the double jeopardy clause did not prevent the government from reinstituting criminal proceedings. The United States Supreme Court affirmed, holding that the reprosecution did not violate double jeopardy principles, while deferring to the judgment of the state court on the issue of whether the respondent breached the plea agreement. 483 U.S. at —— – ——, 107 S.Ct. at 2683–84, 97 L.Ed.2d at 9–10.[12]

---

12. "We will not second-guess the Arizona Su-  preme Court's construction of the language of

Although the *Ricketts* Court failed to reach the issue of whether the respondent's conduct constituted a breach of the plea agreement, we find the reasoning of the Court instructive in resolving the case presently before this Court. Here, as in *Ricketts*, the defendant executed an agreement in which he agreed to assist the government in any proceeding related to the criminal activity giving rise to his plea. While the *Ricketts* agreement required only that the respondent testify at trial, neither agreement expressly limited the scope of the defendants' obligation to cooperate (Ataya) or testify (Adamson). In each case, the defendant testified at the trial(s) of his co-defendant or accomplices, but neither defendant was willing to testify at a retrial of the same co-defendant(s). Finally, the government in each instance notified the defendant that it considered him to be in breach of the agreement for refusing to testify and sought to recharge the defendant for the previously-dismissed offense.

In examining the facts of the instant case, we note that the defendant stated, under oath, that he had read and understood every paragraph in the plea agreement and that he had been assisted by competent counsel throughout the process. "It is well settled that a voluntary and intelligent plea of guilty made by an accused person, who has been advised by competent counsel, may not be collaterally attacked." *Mabry v. Johnson*, 467 U.S. 504, 508, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984).

This Court has ruled that "[t]he record that is created by these [Rule 11] questions is accorded, as we have said, a 'presumption of verity.'" *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987) (quoting *Key v. United States*, 806 F.2d 133, 136 (7th Cir.1986)). When Judge Plunkett questioned the defendant with respect to paragraph 11, the defendant acknowledged that he agreed to cooperate fully in any investigation related to his counterfeiting

operations, and that he would "provide complete and truthful information to government investigators...." This Court has only recently reaffirmed the principle that "rational conduct requires that voluntary responses made by the defendant under oath [during a plea hearing] before an examining judge be binding." *Bontkowski v. United States*, 850 F.2d 306, 314 (7th Cir.1988) (quoting *United States v. Ellison*, 835 F.2d 687, 693 (7th Cir.1987)). The defendant, with the aid of effective counsel, entered a plea agreement with the government and, when squarely questioned by the court if he understood and accepted the terms of the agreement, stated under oath that he intended to be bound by that agreement.

We once again rely on the guidance provided by the Supreme Court in *Ricketts*, in which the Court concluded that the:

> Respondent unquestionably understood the meaning of these provisions. At the plea hearing, the trial judge read the plea agreement to the defendant, line by line, and pointedly asked respondent whether he understood the provisions.... Respondent replied "Yes, sir," to each question.

*Ricketts*, 483 U.S. at ——, 107 S.Ct. at 2685, 97 L.Ed.2d at 11.

At the plea hearing on September 25, 1986, Ataya was expressly asked by the court if he agreed to cooperate fully with the government in any investigation as provided in paragraph 11, to which the defendant replied "Yes, Your Honor." We must assume, absent any evidence to the contrary, that the defendant exercised his free choice in entering the agreement. If the defendant understood paragraph 11 to require less than the full cooperation clearly stated in that provision, one might expect that he would have voiced an objection or sought some clarification of his obligations under the provision. The defendant made no such attempt. As a rational agent, the

---

the plea agreement. While we assess independently the plea agreement's effect on respondent's double jeopardy rights, the construction of the plea agreement and the concomitant obligations flowing therefrom are, within the

bounds of reasonableness, matters of state law, and we will not disturb the Arizona Supreme Court's reasonable disposition of those issues." *Ricketts*, 483 U.S. at ——–—— n. 3, 107 S.Ct. at 2683–84 n. 3, 97 L.Ed.2d at 9 n. 3.

defendant must be presumed to be capable of freely choosing from among the possible courses of action open to him at the time he entered his plea. *Hill v. Lockhart,* 474 U.S. 52, 56, 106 S.Ct. 366, 369, 88 L.Ed.2d 203 (1985); *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970); *Boykin v. Alabama,* 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969); *United States v. Lovett,* 844 F.2d 487, 492 (7th Cir.1988). As a moral agent, the defendant is responsible for these free choices. The defendant's affirmative and unqualified response to the question posed by the court clearly suggests that he understood the cooperation clause to require precisely what it stated: that he cooperate fully with the government in any proceeding or investigation related to his counterfeiting activities. We are convinced, as was the Court in *Ricketts,* that the defendant "unquestionably understood the meaning of these provisions." 483 U.S. at ——, 107 S.Ct. at 2685, 97 L.Ed.2d at 11.

The district court claims that such a reading of paragraph 11 would set "no clear limit to the cooperation expected from Ataya." *Ataya,* 672 F.Supp. at 1099. We disagree. The cooperation expected from the defendant is not infinite in scope, but is, in fact, limited by the very breadth of his own misconduct. While the requirement that the defendant cooperate in any proceeding related to his counterfeiting activities is admittedly broad, it is neither vague nor ambiguous. The more elaborate the counterfeiting scheme operated by the defendant, the greater the government demands placed on the defendant to cooperate. Indeed, the defendant was the *only* person with knowledge of the scope of his operation. Just as the plea agreement in *Ricketts* was limited only by the number of participants in the crime, so too the plea agreement in this case is limited only by the scope of the defendant's counterfeiting operations. Neither agreement placed unreasonable demands on the defendants to cooperate. Neither cooperation provision blurred the demands to be made on the defendants. Once again, we must assume that the defendant weighed the potential

demands paragraph 11 would place on him to cooperate, and, in light of his understanding of his counterfeiting scheme, he determined that the obligations imposed by the agreement were not unduly burdensome. *See, e.g., Hill,* 474 U.S. at 56, 106 S.Ct. at 369; *Lovett,* 844 F.2d at 487.

While the language employed in paragraph 11 may or may not be so common as to be termed "boilerplate," as the district court suggests, *Ataya,* 672 F.Supp. at 1099, the question is not whether paragraph 11 is a general provision frequently utilized by the government in its plea agreements, but whether paragraph 11 is ambiguous and how paragraphs 11 and 12 interrelate. Repetitive use of a phrase may eventually lead the phrase to be classified as "boilerplate," but such a label is of little help in determining the importance or meaning of the phrase. The fact that cooperation clauses are present in nearly every plea agreement is as much an indication of the importance attached to such clauses as the relative lack of significance the label "boilerplate" connotes. In fact, contrary to the assertions made by the defendant, "boilerplate" is defined, not as something routine or general, but as "[l]anguage which is used commonly in documents having a *definite* meaning in the same context *without variation.*" Black's Law Dictionary 159 (5th ed. 1979) (emphasis added). The frequent use of cooperation clauses in plea agreements indicates that such clauses have a *specific* meaning, rather than an improperly general one.

In analyzing whether paragraph 11 is ambiguous, we heartily embrace the language of this Court in *United States v. Cook,* 668 F.2d at 321, cited by the district court below, *Ataya,* 672 F.Supp. at 1098, that "[t]he Government may not rely on favorable judicial construction to cure significant ambiguities in its plea agreements." One of the constitutive aspects of a plea agreement—indeed, of law itself—is that its requirements be made known to those subject to it in an intelligible fashion. *See, e.g., United States v. Kozminski,* —— U.S. ——, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *United States v. Drasen,* 845 F.2d

731, 738 (7th Cir.1988); *Fields,* 766 F.2d at 1167; *Bowler,* 585 F.2d at 854. Burdening a defendant for breaching an ambiguous plea agreement, like punishing one for violating an unpromulgated law, is patently unjust. The obligations assumed by the defendant in paragraph 11, to cooperate fully and testify truthfully, are not of that sort. Paragraph 11 is unambiguous. The defendant clearly understood that he was required to cooperate fully in any investigation related to his counterfeiting activities. Indeed, paragraph 11 itself could not be more explicit: "The defendant agrees he will cooperate *fully ... in any investigation in which he is called upon to cooperate* that is related to ... the charges in this case. Defendant agrees to provide *complete ... information to government investigators...*" (emphasis added). Paragraph 11 twice makes reference to cooperation in terms of a government *investigation,* not limiting the defendant's obligations to mere testimony at trial. Insofar as the government requests were made during the course of an ongoing investigation arising from the defendant's counterfeiting operations, the defendant was required to cooperate fully in that investigation.[13]

This Court has recently reaffirmed the "principle that ambiguous criminal statutes should be construed in favor of leniency." *Drasen,* 845 F.2d at 738. *See also United States v. Bass,* 404 U.S. 336, 347–49, 92 S.Ct. 515, 522–23, 30 L.Ed.2d 488 (1971). "Nevertheless, we recently held that the principle of lenient construction does not require the court to ignore the obvious intention of the legislature in enacting the statute." *Drasen,* 845 F.2d at 738. *See also United States v. Kenngott,* 840 F.2d 375, 383–84 (7th Cir.1987). The liberty interests at stake in a dispute over the meaning of a plea agreement, including the threat of punishment and the stigma that attaches, are similar to those at issue in the interpretation of a criminal statute. *Verrusio,* 803 F.2d at 895. Given the plain meaning of paragraph 11 and the colloquy

between Judge Plunkett and the defendant with respect to that provision, we are firmly convinced that to accept the interpretation of the agreement proffered by the defendant and accepted by the district court would do injury to the agreement, whether it be analyzed by objective standards, *Strawser,* 739 F.2d at 1230, or by the intent of the parties in entering the agreement. *Ohio Casualty Group of Insurance Cos. v. Gray,* 746 F.2d 381, 385 (7th Cir.1984); *Bielak,* 660 F.Supp. at 826 ("One of the basic precepts of contract law is that a court must give effect to the clear and unambiguous terms of a contract when construing it.").

As to the relationship between paragraphs 11 and 12, we read paragraph 12 as an enumeration of the defendant's most immediate and readily identifiable obligation under the agreement, rather than as a limitation on paragraph 11.

It is not uncommon for a more universal statement or proposition to be followed by a series of more particular or specific statements in order to illustrate or clarify the original concept. The process of specification does not necessarily entail the exclusion of propositions left unstated, but may indicate an attempt to illuminate the meaning of the original statement by way of illustration. We believe that to be the case in the instant plea agreement. Paragraph 11 required full cooperation with the government in any proceeding or investigation related to the defendant's counterfeiting operation, and paragraph 12 merely highlighted one form of cooperation—the only form then known by the government to be required of the defendant, but not the only *possible* form. If this Court read every specific provision as a limitation on the defendant's obligations under a plea agreement, we might well be faced with the possibility that *no* specific language would appear in such agreements, thus creating the very ambiguity we have so assiduously sought to deter. *See, e.g., Fields,* 766 F.2d at 1168; *Cook,* 668 F.2d at 321;

---

**13.** Of course, no defendant is required to accede to unreasonable government demands, whether they be substantively or procedurally improper.

The government request to cooperate in the reexamination of its case against the co-defendant cannot be seen as unreasonable.

*DeMichael,* 692 F.2d at 1062–63; *Bowler,* 585 F.2d at 851. While the present dispute could easily have been obviated by simply stating that the defendant's obligations include, *but are not limited to,* testifying at the trial of Mr. Syammach, there is no reason to believe that paragraph 12 constitutes "the only promise made by Ataya with respect to the giving of testimony." *Ataya,* 672 F.Supp. at 1098. The fact that the agreement did not expressly speak to the defendant's responsibilities under every conceivable circumstance (*e.g.,* the retrial of Mr. Syammach, the discovery of additional co-defendants, and so on) does not render the agreement ambiguous. No document can foreclose every possibility. The instant plea agreement unambiguously set forth the defendant's obligations. No more is required.

Furthermore, there is no linguistic requirement that the word "specifically"— the term chosen to link paragraphs 11 and 12—necessarily implies a restriction or limitation on paragraph 11. "Specifically" is defined as "in regard to the matter in question" or "with exactness or precision." Webster's Third New International Dictionary 2187 (1981). Thus, "specifically" denotes precision rather than limitation. Such a definition coincides with our interpretation of paragraph 11 set forth above, *i.e.,* that paragraph 12 served to illustrate one form of cooperation required of the defendant. The distinction is fine, to be sure, but we understand the word to function in accordance with its actual meaning; that is, "specifically" links paragraph 12 to the matter in question (the defendant's obligation to cooperate fully and testify truthfully) by detailing one of the defendant's obligations under the agreement with precision.

The district court's reliance on the possibility of deportation that is created under the agreement as an indication that paragraph 11 is more limited than we have supposed is similarly misplaced. Clearly, the government could not expect to profit from the defendant's cooperation following his deportation. In that sense, the agreement places some form of a timeliness requirement on the government. If the government chooses to deport the defendant, his obligation to cooperate in related proceedings is extinguished. The choice to institute deportation proceedings, however, is left to the government. The defendant is not entitled to be deported under the agreement, but has merely agreed not to oppose such proceedings. Just as the defendant must suffer the consequences for breaching an agreement he entered purposefully, so too the government would be forced to forego the cooperation of the defendant if it should deport him prior to completing its investigation of his counterfeiting activities.

The fact that the defendant's obligations under the agreement extend beyond testifying at the trial of co-defendant Syammach is evidenced by a number of other provisions in the agreement. In addition to the obvious fact that the defendant's obligation to serve his sentence extends well beyond the single act of testifying at Mr. Syammach's trial, the agreement also requires the defendant to notify the United States Attorney General and the United States Probation Office if he reenters the United States after deportation. More importantly, paragraph 14 provides that the "[d]efendant understands that his compliance with each part of the agreement extends throughout and beyond the period of his sentence...." If the sole promise made by the defendant was to testify at the forthcoming trial of Mr. Syammach, paragraph 14 would be rendered moot, for the cooperation clause contained in paragraph 11 would not even extend to the date of his sentencing (which was after Syammach's trial), let alone "throughout and beyond the period of his sentence...."

We are troubled by the failure of the district court to consider the implications of paragraph 14 in interpreting the agreement. "[A] contract should be construed as a whole, so that various provisions of the contract are harmonized and none are rendered meaningless." *In re Chicago, Rock Island and Pac. R.R. Co. v. Richmond, Fredericksburg and Potomac R.R. Co.,* 835 F.2d 682, 686 (7th Cir.1987). *See also* Restatement (Second) of Contracts

§ 203(a) (1981). Paragraph 14, when coupled with paragraphs 11 and 12, clearly establishes that paragraph 12 was not a limitation on paragraph 11. If the full cooperation required in paragraph 11 was reduced to testifying at the trial of Mr. Syammach, the defendant's compliance with the agreement beyond the period of his sentence would be unintelligible.

Judge Plunkett's statement that the defendant would be able to return to his native country in a few months was, in our judgment, more a reflection of the judge's innate kindness and a casual observation on the typical course of events than an effort to interpret the agreement. If the government turned over the *Brady* material and its investigation failed to discover others involved in the operation, as Judge Plunkett seemingly expected, then the defendant would indeed be returning to his native country in a few months—had the government chosen to institute deportation proceedings. There is nothing in Judge Plunkett's comment, however, that indicates to us that he intended to restrict the agreement in a manner different from that when he was consciously treating paragraph 11.

With respect to the district court finding that any alleged breach was anticipatory, *Ataya*, 672 F.Supp. at 1099, we suggest that the absence of a firm government decision to reprosecute Mr. Syammach is irrelevant to the question of whether the defendant breached the plea agreement. Once again, the district court reaches its conclusion based on an assumption that paragraph 12 encompassed the totality of the defendant's obligations under the agreement.

Paragraph 11 required the defendant to cooperate fully in any proceeding related to his counterfeiting activities, including any government investigation. The defendant's refusal to testify at the retrial of Mr. Syammach can be seen as a breach of his plea agreement under one of three different theories. First, the defendant's refusal to testify effectively stymied the government investigation with respect to Mr. Syammach. Such conduct can hardly be viewed as complying with the requirement that the defendant "provide complete and truthful information to government investigators, including truthful testimony, if called upon to testify...." Second, and more convincingly, one component of "cooperation" is the giving of testimony. Cooperation and testimony are not separate and distinct categories of conduct, but rather testimony is more properly seen as a species belonging to the genus cooperation. While paragraph 12 only required testimony, paragraph 11 imposed a broader obligation on the defendant—to cooperate fully. Inasmuch as testimony is an aspect of cooperation, the defendant breached the cooperation clause in paragraph 11 the moment he refused to testify at a second trial. Third, "where the contract is renounced before performance is due, and the renunciation goes to the whole contract, and is absolute and unequivocal, the injured party may treat the breach as complete and bring his action at once." *Roehm v. Horst*, 178 U.S. 1, 7, 20 S.Ct. 780, 44 L.Ed. 953 (1900). *See also* Restatement (Second) of Contracts § 250. Thus, even if the performance due is testimony rather than cooperation, the defendant's unequivocal refusal to testify unquestionably "went to the whole contract," thereby permitting the government to treat the defendant's threat as a breach of his plea agreement.

The most nearly analogous case is that of *United States v. Wood*, 780 F.2d at 929, in which a defendant entered a plea agreement requiring, *inter alia*, that he disclose any and all information he had regarding drug operations in Jacksonville, Florida, to federal agents. The district court ruled that the defendant's subsequent failure to make a full disclosure to the government did not constitute a breach of the agreement because the government had not made a specific inquiry with respect to the undisclosed information. *Id.* at 931. The Eleventh Circuit reversed, ruling that the defendant was "required to *fully* disclose all information that he possessed concerning drug activities." *Id.* at 931–32 (emphasis added). In failing to make a total disclosure, the defendant had breached the terms of the plea agreement. *Id.* at 932.

Insofar as the defendant in the instant case had an obligation to cooperate *fully* with the government in any proceeding or investigation related to his counterfeiting operation, he breached his plea agreement in refusing to cooperate with the government in its reexamination of the Syammach case.

The district court's conclusion that the defendant "is not likely to change his mind and testify," *Ataya*, 672 F.Supp. at 1099, simply misses the point. The likelihood of compliance with a plea agreement cannot serve as the indicium of compliance, and the defendant's obstinance is no reason for acquiescence to his demands.

Finally, the finding by the district court that the defendant acted in good faith and may therefore rely on his interpretation of the agreement must be rejected. One's state of mind is a question of fact, *Pistas v. New England Life Insurance Co.*, 843 F.2d 1038, 1040 (7th Cir.1988), and the defendant adduced no evidence indicating that he acted in good faith. The district court simply inferred good faith on the part of the defendant, despite the fact that the defendant repeatedly informed the government that he refused to testify, only to equivocate and later indicate, generally after consultation with counsel, that he would cooperate. At no time did the defendant offer an explanation for his refusal or seek to justify his lack of cooperation. While the defendant was not required to explain his motives, and silence cannot be used to infer a breach or bad faith, experience tells us that one who believes that he has been wronged typically, though not necessarily, expresses resistance to the perceived injustice. The defendant never informed the government that, in his mind, he had fulfilled his obligations under the agreement, or that the government was exceeding the limits of the agreement in requiring the defendant to testify at a possible retrial. The defendant, like the respondent in *Ricketts*, did not "explain the basis for his refusal to testify" until formal court proceedings were commenced. *Ricketts*, 483 U.S. at —— n. 3, 107 S.Ct. at 2683 n. 3, 97 L.Ed.2d at 9 n. 3. The relevant evidence is at best equivocal as to whether the defendant acted in good faith and may therefore rely on his proposed interpretation of the agreement. We need not and do not reach the question of whether the defendant acted in *bad* faith, but simply refuse to accept the district court finding, without any basis in the evidence before the court, that the defendant acted in good faith in refusing to cooperate with the government.

### IV.

In order for this Court to reverse the ruling of the district court that the government failed to prove a substantial breach of the plea agreement by a preponderance of the evidence, *United States v. Gonzalez–Sanchez*, 825 F.2d 572, 578 (1st Cir.1987); *Verrusio*, 803 F.2d at 894–95; *Calabrese*, 645 F.2d at 1390; *Simmons*, 537 F.2d at 1261; *Ataya*, 672 F.Supp. at 1099; *Bielak*, 660 F.Supp. at 824, we must find the district court determination to be "clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 572, 105 S.Ct. 1504, 1510, 84 L.Ed.2d 518 (1985); *Fields*, 766 F.2d at 1168; *Strawser*, 739 F.2d at 1229; Fed.R. Civ.P. 52(a).

Although "[t]he reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower courts," *Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511, "[d]ocuments or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it. Where such factors are present, the court of appeals may well find clear error even in a finding purportedly based on a credibility determination." *Id.* at 575, 105 S.Ct. at 1512. Although a credibility determination "can virtually never be clear error," *id.*, the standard is somewhat less rigid when applied to documents or other objective evidence, such as the plea agreement at issue in this case.

A finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." *United*

*States v. United States Gypsum Co.,* 333 U.S. 364, 375, 68 S.Ct. 525, 532, 92 L.Ed. 746 (1948). *See also Anderson,* 470 U.S. at 573, 105 S.Ct. at 1511; *Strawser,* 739 F.2d at 1229.

We do not dispute that the record is muddied by the presence of an ill-chosen word connecting paragraphs 11 and 12 and the somewhat confusing colloquy between Judge Plunkett and the defendant at the plea hearing. These two isolated facts, however, given the great weight of the evidence to the contrary and the fact that each may be properly accounted for when placed in context, are insufficient to shield the district court determination as "plausible" in light of the record when viewed in its entirety. *Anderson,* 470 U.S. at 573–74, 105 S.Ct. at 1511; *Hughes v. United Van Lines, Inc.,* 829 F.2d 1407, 1416 (7th Cir. 1987). Although "there is evidence to support" the district court finding, we conclude that the unambiguous obligations assumed by the defendant under paragraph 11 and his unequivocal statement that he understood and accepted these obligations at the plea hearing leave us with the "definite and firm conviction that a mistake has been made." *United States Gypsum Co.,* 333 U.S. at 375, 68 S.Ct. at 532. Accordingly, we reverse.

### V.

It is well-established that a "defendant's failure to fulfill the terms of a pretrial agreement relieves the government of its reciprocal obligations under the agreement." *Calabrese,* 645 F.2d at 1390. *See also Verrusio,* 803 F.2d at 888; *Wood,* 766 F.2d at 929; *Simmons,* 537 F.2d at 1261. In ruling that the defendant breached his plea agreement, we note that "[t]he State did not force the breach; respondent chose, perhaps for strategic reasons or as a gamble, to advance an interpretation of the agreement that proved erroneous." *Ricketts,* 483 U.S. at ——, 107 S.Ct. at 2686, 97 L.Ed.2d at 13. As such, the government is no longer barred from seeking to reindict the defendant for violating 18 U.S.C. § 471. The district court order dismissing the one-count superseding indictment against the defendant, Amin Ataya, is VACATED and the ruling that the defendant did not breach his plea agreement by refusing to testify in the possible retrial of his co-defendant is REVERSED and the case REMANDED to the district court.