974 F.2d 1340
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Juan GONZALEZ and Jesus Orduna, Defendants-Appellants.
 Nos. 91-1640, 91-2234.
 United States Court of Appeals, Seventh Circuit.
 Argued May 19, 1992.
Decided Aug. 25, 1992.
 
 Before CUMMINGS and COFFEY, Circuit Judges, and FLOYD R. GIBSON, Senior Circuit Judge.*
 
 ORDER
 
 1
 In July 1990, Juan Gonzalez, Jesus Orduna and Ruben Alcantar were charged in a two-count indictment with (I) conspiracy to possess cocaine with intent to distribute in violation of 21 U.S.C. § 846 and aiding and abetting in violation of 18 U.S.C. § 2, as well as (II) possession of approximately five kilograms of a mixture containing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). At arraignment, each of the three defendants entered a plea of not guilty. In December of 1990, after the district court had denied Gonzalez's Motion to Quash Warrant and Suppress Evidence, he entered a guilty plea with respect to Count I of the indictment under a written plea agreement and pursuant to Rule 11 of the Federal Rules of Criminal Procedure. The plea agreement required him "to fully cooperate with the government" and "to provide complete and truthful testimony" at court proceedings. In return for his full cooperation, the government agreed to drop Count II and to recommend a sentence of 90 months for his substantial assistance, even though the statutorily imposed minimum sentence was 120 months' imprisonment. Judge Norgle approved the agreement and thereafter Gonzalez pleaded guilty to the Count I conspiracy charges.
 
 
 2
 The trial against co-defendant Jesus Orduna commenced on February 5, 1991, resulting in his conviction on both counts of the indictment. During that trial, Gonzalez was called upon to testify against co-defendant Orduna. Gonzalez testified falsely and admitted that he had lied to the government during the preparation for the trial. On the basis of Gonzalez's false testimony, the government successfully moved to set aside its plea agreement with Gonzalez. Four days thereafter, on February 26, 1991, Gonzalez reentered his plea of guilty to Count I of the indictment and the district judge subsequently sentenced him to the minimum term of 120 months' imprisonment plus five years of supervised release and a special assessment of $50.
 
 
 3
 On May 28, 1991, Orduna was sentenced to 121 months' imprisonment, five years of supervised release, and a special assessment of $100. Both defendants have appealed.
 
 I. Gonzalez: Breach of Plea Agreement
 
 4
 Under the plea agreement Gonzalez promised full cooperation with the government and complete and truthful testimony at court proceedings. But at Orduna's trial Gonzalez gave false testimony and admitted to providing false information to the government during the preparation of the case against Orduna. Gonzalez does not dispute that he gave false information to the government before Orduna's trial, and false testimony under oath at that trial (Br. 2-3). However, he asserts that despite some false statements, his testimony was substantially truthful. As such, he argues that he partially complied with the plea agreement, and that although he should not receive full credit, he should receive at least some credit for his "partial performance" of the plea agreement. However, his half-truths do not compel the government to accord half-credit. The plea agreement required him to provide "complete and truthful testimony." Just four years ago, citing four supporting authorities, we held that a defendant's failure to fulfill the terms of a pre-trial agreement relieves the government of its reciprocal obligations. United States v. Ataya, 864 F.2d 1324, 1338 (7th Cir.1988). When a defendant offers false testimony under oath, even when intermingled with truthful testimony, he has not fulfilled the terms of this agreement. See United States v. Britt, 917 F.2d 353 (8th Cir.1990), certiorari denied, 111 S.Ct. 971.
 
 
 5
 Once the district court set aside the plea agreement, it was within the prosecutor's discretion whether to make a motion for downward departure based on substantial assistance. The Supreme Court recently held that the government can refuse to file a motion seeking reduction below statutory minimum sentences in return for substantial assistance unless the refusal is based on an unconstitutional motive. Wade v. United States, --- U.S. ----, 112 S.Ct. 1840. Gonzalez has never alleged that the government's motion to set aside the plea agreement was based on an unconstitutional motive. Therefore the judgment of conviction of Gonzalez is affirmed.
 
 II. Orduna
 A. Sufficiency of Evidence
 
 6
 Orduna first argues that there was insufficient evidence of his guilt. However, a review of the evidence in the light most favorable to the government, as required, reveals sufficient evidence to support Orduna's conviction.
 
 
 7
 On June 28, 1990, Gonzalez and co-defendant Ruben Alcantar met Special Agent Rafael Tovar at a Chicago park to discuss selling cocaine to him. Gonzalez stated that his cocaine source had been "ripped off" so that the deal would have to be postponed until that evening. Tovar, acting in an undercover capacity as a Detroit cocaine buyer, displayed $110,000 in cash and gave Gonzalez his beeper number to use when Gonzalez was ready to proceed.
 
 
 8
 At 7 P.M. and at midnight on the same day, Gonzalez called Orduna's beeper number, which he carried on a card that listed him as a supplier of cocaine. Orduna did not return the calls, and Gonzalez and Tovar agreed to proceed the next day if Gonzalez could find a supplier. On the next day Orduna returned a third call from Gonzalez and told Gonzalez that he had 15 kilograms of cocaine to sell. Orduna went to Gonzalez's workplace in order to discuss the transaction. Gonzalez then beeped Tovar to advise him of the availability of 15 kilograms at $33,000 per kilogram. At 4:20 p.m. on June 29, Tovar advised Gonzalez by beeper that he only had enough money to purchase nine kilograms. Gonzalez told Tovar to meet him and his source around 6 P.M. in the vicinity of 22nd Street and Ashland Avenue in Chicago, and later instructed Tovar to meet him at an Amoco station.
 
 
 9
 Before Tovar arrived, Orduna and Gonzalez met at the Amoco station and then drove a short distance to Orduna's apartment house in separate cars. An officer who was conducting surveillance testified that Orduna entered the building empty-handed and emerged from the building carrying a blue Corona beer box that Orduna placed in the trunk of Gonzalez's car. Orduna and Gonzalez drove Gonzalez's car back from Orduna's apartment to the Amoco station. Before reaching the Amoco station, Orduna had Gonzalez drop him off at the "Tasty Freeze" across the street. Gonzalez met Tovar at the Amoco station where they agreed to finalize the deal at the Fabiola Beauty Shop. Orduna then walked across the street and joined them at the Amoco station. Without having opened the Corona box, Gonzalez told Tovar that he only had five kilograms of cocaine to sell. This entire conversation was recorded by Tovar's body microphone.
 
 
 10
 Thereafter Orduna and Gonzalez drove together to the beauty shop. Orduna waited outside for Tovar's arrival while Gonzalez went inside. When Tovar arrived a few minutes later, Orduna left him to advise Gonzalez of Tovar's arrival. Thereupon Gonzalez told Tovar to accompany him to a gangway next to the beauty shop. Orduna entered the beauty shop when a Chicago police car appeared nearby.
 
 
 11
 In an apartment off the gangway Gonzalez asked Tovar to display the money. Tovar refused and asked Gonzalez to show him the cocaine. Gonzalez entered the beauty shop to ask Orduna for instructions. A few minutes later Agent Tovar's electronic arrest signal accidentally activated and Orduna and Gonzalez were thereupon arrested. Orduna called himself Jose Garcia, contrary to his driver's license and insurance card which listed his home as the address from which he carried the Corona beer box. He had $2,947 in his pocket in 20- and 50-dollar bills. The Corona beer box he placed in the car trunk, which had been kept under surveillance by the police, was not touched or opened until after the defendants had been arrested. When the Corona box was opened, five kilogram-sized bricks of cocaine were found. A beeper belonging to Orduna was also found at his residence.
 
 
 12
 Given trial testimony as to these facts, there was ample evidence to support Orduna's conviction. At trial Gonzalez testified to the details of the cocaine transaction, that he contacted Orduna, that he conspired with Orduna to sell cocaine to Agent Tovar, and that Orduna supplied the cocaine for sale. Gonzalez carried a card which listed his cocaine suppliers and contained Orduna's beeper number. Orduna carried a card that listed Gonzalez's work number. Orduna was present when Gonzalez received the cocaine, when Gonzalez met with Tovar to finalize the deal, and at the location of the proposed sale. In addition Orduna placed the box containing five kilograms of cocaine into Gonzalez' car trunk, watched for Tovar at the beauty shop and directed him to Gonzalez when he arrived. Unlike United States v. Penagos, 823 F.2d 346 (9th Cir.1987), on which Orduna relies, in this case not only was Orduna present at critical stages of the deal, but actually put the box containing the cocaine into the trunk of Gonzalez's car.
 
 
 13
 Considering the above evidence, Orduna's claim of insufficient evidence to support drug conspiracy and possession must fail.
 
 B. "Ostrich" Instruction
 
 14
 At trial Orduna admitted being at the various places where the cocaine was being transferred to the seller and then sold to the buyer, but he denied knowing that a transaction was occurring. Consequently, Judge Norgle decided to give the following "ostrich" instruction at the end of the case:
 
 
 15
 When the word "knowingly" is used in these instructions, it means that the defendant realized what he was doing and was aware of the nature of his conduct, and did not act through ignorance, mistake, or accident. Knowledge may be proved by the defendant's conduct, and by all the facts and circumstances surrounding the case. You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used the word.
 
 
 16
 Orduna challenges this instruction, but we have frequently approved this wording. See, e.g., United States v. Strickland, 935 F.2d 822 (7th Cir.1991), as well as the use of this instruction in similar situations. See, e.g., United States v. Gonzalez, 933 F.2d 417, 434 (7th Cir.1991). Despite the factors summarized above indicating his guilt, Orduna claimed that he did not know the Corona beer box he was carrying contained five kilograms of cocaine. Therefore it was appropriate to give the "ostrich" instruction.
 
 
 17
 The convictions of Gonzalez and Orduna are affirmed.
 
 
 
 *
 The Honorable Floyd R. Gibson, Senior Circuit Judge of the United States Court of Appeals for the Eighth Circuit, is sitting by designation